**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4848

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BRIAN BOWMAN,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, District Judge.  (1:15-cr-00101-MR-DLH-2)

Argued:  December 7, 2017                          Decided:  March 1, 2018

Before TRAXLER, KING, and HARRIS, Circuit Judges.

Vacated and remanded by published opinion.  Judge Traxler wrote the opinion in which Judge King and Judge Harris joined.

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Ross Hall Richardson, Federal Public Defender, Interim, FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF NORTH CAROLINA, Charlotte, North Carolina, for Appellant. Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

TRAXLER, Circuit Judge:

Brian Bowman appeals the district court's denial of his motion to suppress evidence recovered from a dog sniff conducted after an already-completed traffic stop. We conclude that the police officer had neither Bowman's consent to extend the traffic stop nor a reasonable, articulable suspicion of ongoing criminal activity to justify doing so. Accordingly, the prolonged traffic stop abridged Bowman's right under the Fourth Amendment to be free of unreasonable seizures. We vacate Bowman's conviction for possession with intent to distribute methamphetamine and remand for such further proceedings as may be appropriate.

I.

At the suppression hearing before the magistrate judge, the government submitted a dashcam video recording of the entire traffic stop and presented the testimony of the arresting officer, Trooper Andrew Waycaster of the North Carolina State Highway Patrol's Criminal Interdiction Unit. The evidence adduced at the hearing was as follows. In the early morning hours of June 20, 2015, Waycaster was patrolling U.S. Route 25 in Henderson County, North Carolina. He received a tip from the Drug Enforcement Agency (DEA) that two individuals suspected of transporting methamphetamine from Atlanta to the Asheville and Hendersonville areas were possibly driving "a red, older model Lexus" in the area. J.A. 82. Additionally, the DEA provided the license plate number for the vehicle. At about 3:40 a.m., Waycaster spotted a red 1998 Lexus traveling north on U.S. Route 25 and followed in his patrol vehicle. Rather than stop the vehicle based on the information provided by the DEA, Waycaster was "looking for [his]

2

own infractions . . . for [his own] reason to stop the vehicle." J.A. 86.[1]  According to Waycaster, the red Lexus weaved over the fog line and accelerated up to a steady 10 miles per hour over the speed limit, leading Waycaster to believe that the driver might be operating under the influence of alcohol or drugs.

Waycaster stopped the Lexus, approached from the passenger side of the vehicle and asked both occupants to show their hands.  Bowman was the driver, and Homero Alvarez occupied the front passenger's seat.  Waycaster testified that Bowman appeared to be nervous because his hands were shaking when he handed over his vehicle registration and driver's license.  Waycaster indicated that Alvarez "was continually staring straight ahead" rather than looking at him, behavior that Waycaster found suspicious.  J.A. 90.  Waycaster further testified that he saw movement in Bowman's and Alvarez's carotid arteries, leading him to conclude that both men had elevated heart rates and were nervous.

Waycaster did not see any alcohol or firearms.  However, Waycaster took note of several items in Bowman's car, including an energy drink in the front seat console, food and food wrappers in the front seat, and a suitcase and loose items of clothing in the back seat.  According to Waycaster, the presence of these items suggested that Bowman and Alvarez "could have been possibly traveling for a . . . long period of time, and in a hurry to get from one location to another [without] taking time to stop and rest or have meals." J.A. 91.

---

[1]  The government agrees the DEA tip should not be considered in any way in our legal analysis.

3

Waycaster told Bowman that "the reason for the traffic stop was the weaving and speeding violations," and he asked Bowman to exit his vehicle and go back to the patrol car so that Waycaster could check his information. J.A. 93. Alvarez remained seated in the Lexus. After stepping out of his vehicle, Bowman consented to a weapons frisk, and Waycaster found none. Waycaster testified that during this time, he could see Alvarez moving around in the front of the Lexus and looking back towards Waycaster and Bowman—activity that Waycaster believed was an additional indicator of nervousness.

Waycaster then instructed Bowman to sit in the patrol vehicle while he ran a check on Bowman's driver's license and vehicle registration. Bowman complied and sat in the patrol car's front passenger's seat. While Waycaster processed Bowman's driving information, Bowman apologized for speeding and stated that he believed he had been traveling within the speed limit. As for the weaving, Bowman told Waycaster that he had purchased the Lexus during the previous week, and that he was having issues with the front end of the vehicle. Bowman also indicated that he was tired.

Waycaster then asked Bowman where he and Alvarez had come from and where they were going. At the hearing, Waycaster maintained he asked this question based not on the DEA tip but rather based on "the time of morning, 3:40 in the morning, and his increased nervousness." J.A. 98. Bowman responded that he was "headed home" after having "picked up Mr. Alvarez at [Alvarez's] girlfriend's house" 25 to 30 minutes earlier, J.A. 97-98, and explained that Alvarez was a good friend who had given him a ride in the past and that Bowman was returning the favor because "Alvarez's vehicle wasn't legal," J.A. 100. Bowman was unable to give Waycaster the girlfriend's address

4

but offered that he had entered the location into the GPS in his Lexus. Bowman stated that he lived in Black Mountain, North Carolina, but that he had been staying with his girlfriend near Fletcher, North Carolina. He also indicated that he lived about twenty minutes away from Alvarez.

Waycaster also asked Bowman what he did for a living. Bowman stated that he was a welder and fabricator but that he was presently laid off from work. Waycaster further asked Bowman if he had any prior speeding tickets, and Bowman responded that he had one prior ticket while using a different vehicle that he had purchased using Craigslist. He did not indicate when he had purchased the vehicle. Bowman added that he "buy[s] cheap cars off of Craigslist." J.A. 154. Waycaster testified that he found it suspicious that Bowman "was in possession of one car and admitted he recently bought another car off Craigslist" because "[i]t's a known practice with narcotics traffickers to either use rental vehicles or use multiple, different vehicles, or buy and sell vehicles to transport narcotics." J.A. 101. Also, Waycaster was skeptical about Bowman's ability to purchase "multiple vehicles in a short period of time" while he was laid off. J.A. 154.

After speaking with Bowman, Waycaster did not believe he was driving under the influence and issued him a warning for speeding and unsafe movement of the vehicle. Waycaster then completed the traffic stop by returning Bowman's driver's license and registration and shaking his hand.

As Bowman began to exit the patrol vehicle, Waycaster asked if he could speak with Bowman further. Bowman consented and remained in the patrol car. Waycaster asked additional questions "to clarify where he had been" that evening. J.A. 103. In

5

response to Waycaster's prompting, Bowman reiterated that he had picked up Alvarez from Alvarez's girlfriend's place, that he was not sure precisely where she lived, and that the location of the pick up could be found in the Lexus's GPS. When pressed by Waycaster to tell him generally where she lived, Bowman indicated it was in North Carolina and that he and Alvarez had been driving for 25-30 minutes when Waycaster stopped them. Waycaster also asked for the girlfriend's name, but Bowman did not know it.

Waycaster then stated to Bowman, who was still seated in the patrol car, that he "was going to go ask [Alvarez] questions if you don't mind, okay?" Bowman responded, "okay," and remained in the vehicle. Then, as Waycaster was getting out of the patrol car, he told Bowman, "just hang tight right there, okay," to which Bowman said, "oh, okay." Waycaster testified that at this point, Bowman was "not free to get out of that police car to leave" because Waycaster had developed from the *traffic stop alone* a reasonable suspicion of criminal activity sufficient to detain Bowman further. J.A. 164.

Waycaster then walked to the passenger side of the Lexus and began posing questions to Alvarez about where they had been that morning. Alvarez gave an inconsistent story, telling Waycaster that they had been visiting friends in Georgia. Waycaster then returned to his patrol car and, after Bowman repeated that he and Alvarez had come from the home of Alvarez's girlfriend, Waycaster asked if there was any methamphetamine in the Lexus. Bowman responded in the negative. Waycaster asked for permission to search the Lexus, but Bowman refused. Once again, Waycaster told Bowman to "hang tight, okay" and then removed Alvarez from the Lexus, frisked him for

6

weapons, and placed him in the patrol car with Bowman. A K-9 officer was summoned who then conducted a pass around the outside of the Lexus—and then on the interior of the vehicle—and received an alert from the dog for the presence of illegal narcotics. Subsequently, Waycaster and the K-9 handler conducted a search of the interior of the Lexus and found a quantity of methamphetamine, digital scales and containers of ammunition.

Bowman was charged in a single-count indictment with possession with intent to distribute at least 50 grams of methamphetamine. Bowman filed a motion to suppress the methamphetamine and other evidence recovered from the search of his car, arguing that Waycaster unlawfully prolonged the completed traffic stop without consent or reasonable suspicion. *See Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

The magistrate judge recommended that the district court deny Bowman's motion to suppress. First, the magistrate judge explained that once Waycaster concluded the traffic stop, he needed either Bowman's consent or reasonable suspicion to detain him further. The magistrate judge implicitly found that Bowman consented to the few additional questions Waycaster asked after the completion of the traffic stop, when "Trooper Waycaster plainly and unequivocally ask[ed] Defendant Bowman for permission . . . to ask him a few follow up questions." J.A. 275. However, the magistrate judge found that after Bowman answered these additional questions, Waycaster detained Bowman without his consent so that Waycaster could question Alvarez and search the vehicle:

7

Defendant Bowman [was] not given an opportunity to decline Trooper Waycaster's request to extend the stop so that he [could] question Alvarez. Trooper Waycaster direct[ed] Defendant Bowman to stay in the patrol car while he questioned Alvarez. At no point [did] Trooper Waycaster tell Defendant Bowman that he [was] free to leave or even imply that Defendant Bowman could decline to remain in the patrol car while Trooper Waycaster question[ed] Alvarez.

J.A. 275. Noting Waycaster's testimony that "Bowman was *not* free to leave at that time and that he could not have gotten out of the patrol car, terminate the encounter, [or] leave the scene," the magistrate judge concluded that "[u]nder the totality of the circumstances, a reasonable person in Defendant Bowman's position would not have felt free to leave and terminate the traffic stop after being directed by Trooper Waycaster to remain in the patrol car while the officer questioned the passenger." J.A. 275-76.

Nonetheless, the magistrate judge concluded that the prolonged detention was permissible because "Waycaster had a justified, reasonable suspicion that Defendant Bowman was engaged in criminal activity." J.A. 278. The magistrate judge identified several factors he believed collectively provided Waycaster with a reasonable suspicion that Bowman was engaged in criminal activity: Bowman's and Alvarez's nervousness during the traffic stop; the presence of items suggesting that Bowman was not being truthful about how long he had been traveling, including a suitcase, loose clothes, an energy drink, food and food wrappers; Bowman's inability to state where Alvarez's girlfriend lived; Bowman's statement that "he had just purchased the [Lexus] despite being recently laid off," J.A. 277; and Bowman's statement that "he bought cheap cars off of Craigslist," which Waycaster indicated was in accord with the "known practice of drug traffickers . . . [of using] multiple, different vehicles to transport narcotics," *id.*

8

The magistrate judge reasoned that even though many "of the statements of Defendant Bowman and the observations of Trooper Waycaster might on their own appear consistent with innocent travel – the presence of an energy drink for example – the totality of the circumstances in this case was sufficient to provide Trooper Waycaster with a particularized and objective basis for suspecting legal wrongdoing." J.A. 278 (internal quotation marks omitted). Thus, the magistrate judge concluded that "Waycaster did not violate the Fourth Amendment by extending the traffic stop in order to question Alvarez." J.A. 278.[2] The magistrate judge recommended that the District Court deny the motion to suppress. The district court adopted the recommendation of the magistrate judge and denied the motion to suppress. Bowman then entered a conditional guilty plea, preserving his right to challenge the denial of his motion to suppress. The court imposed a sentence of 57 months' imprisonment. Bowman filed this appeal.

II.

---

[2] Additionally, the magistrate judge concluded that "Waycaster had a particularized and objective basis" for "further extend[ing] the stop to conduct the dog sniff." J.A. 279. The court based this conclusion on "the previously discussed factors that led to Trooper Waycaster extending the stop to question Alvarez," in addition to the "conflicting stories" provided by Alvarez and Bowman regarding the location from which they were traveling. And, finally, the magistrate judge concluded that after the dog had alerted on the vehicle, Waycaster had probable cause to search the vehicle.

Because we conclude that Waycaster did not have a reasonable suspicion to justify *extending* the traffic stop in order to question Alvarez, *Alvarez's responses* cannot be considered. The question is whether there was reasonable suspicion to extend the stop in order to question Alvarez. Indeed, as noted, Waycaster believed he had a reasonable suspicion of criminal activity *before* questioning Alvarez. Thus, we cannot consider the effect of Alvarez's responses on the reasonable suspicion calculus.

We apply a *de novo* standard of review to a district court's determination that an officer had reasonable suspicion to prolong a traffic stop. *United States v. Williams*, 808 F.3d 238, 244 (4th Cir. 2015) (reviewing *de novo* court's conclusion that reasonable suspicion existed to justify extending traffic stop to conduct dog sniff); *see Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."). In doing so, however, we "review findings of historical fact only for clear error." *Ornelas*, 517 U.S. at 699. When, as in this case, "a motion to suppress has been denied, we view the evidence in the light most favorable to the government." *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012). In reviewing the denial of a motion to suppress, this court "is not limited to the district court's reasoning, and we are entitled to . . . affirm on any ground supported by the record." *United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (internal quotation marks omitted).

### III.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). An automobile stop, therefore, is subject to the reasonableness requirement of the Fourth Amendment. *See id.* at 810 ("An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."). An automobile stop is "more akin to an investigative detention than a custodial arrest." *Williams,* 808 F.3d at 245. Accordingly, in determining whether a traffic stop is reasonable, we apply the

10

standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), wherein the court asks (1) if the stop was "legitimate at its inception," *United States v. Hill,* 852 F.3d 377, 381 (4th Cir. 2017), and (2) if "the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop," *Williams,* 808 F.3d at 245 (internal quotation marks omitted). Bowman does not challenge the reasonableness of the initial traffic stop in this case. An officer's initial "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Bowman does not suggest that Waycaster did not have a legitimate basis for pulling him over. However, a seizure that is "lawful at its inception can nevertheless violate the Fourth Amendment because its *manner* of execution unreasonably infringes" on rights protected by the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (emphasis added). Therefore, the question in this appeal is whether Waycaster's actions during the stop were reasonable under the circumstances; specifically, did he trench upon Bowman's Fourth Amendment rights when he extended an otherwise-completed traffic stop?

A lawful traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission" of issuing a warning ticket. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The permissible duration of a traffic stop "is determined by the seizure's mission—to address the traffic violation that warranted the stop," meaning that it may "last no longer than is necessary to effectuate that purpose." *Rodriguez*, 135 S. Ct. at 1614 (alteration and internal quotation marks omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or

11

reasonably should have been—completed." *Id.* Ordinary tasks incident to a traffic stop include "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *Hill*, 852 F.3d at 382. A dog sniff around the vehicle's perimeter for the purpose of detecting narcotics "is not an ordinary incident of a traffic stop." *Rodriguez*, 135 S. Ct. at 1615.

The Fourth Amendment permits an officer to conduct an investigation *unrelated* to the reasons for the traffic stop as long as it "[does] not lengthen the roadside detention." *Rodriguez,* 135 S. Ct. at 1614; *see Hill*, 852 F.3d at 382 ("While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction . . . only as long as that activity does not prolong the roadside detention for the traffic infraction."). For instance, police *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction, *see Arizona v. Johnson*, 555 U.S. 323, 333 (2009), or perform a dog sniff around the outside of a vehicle, *see Caballes*, 543 U.S. at 409, as long as the police do not "extend an otherwise-completed traffic stop in order to conduct" these unrelated investigations, *Williams*, 808 F.3d at 245. But, as noted previously, a traffic stop becomes unlawful when it is prolonged beyond the point at which "tasks tied to the traffic infraction are—or reasonably should have been—completed," *Rodriguez*, 135 S. Ct. at 1614, even if only for a *de minimis* period of time, *see id.* at 1615-16. Therefore, in order "to extend the detention of a motorist beyond the time necessary to accomplish a

traffic stop's purpose, the authorities must either possess reasonable suspicion or receive the driver's consent." *Williams*, 808 F.3d at 245-46 (internal quotation marks omitted).

## A. Consensual Encounter or Non-consensual Seizure?

Because purely consensual encounters are not subject to Fourth Amendment scrutiny, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991), while all seizures, even brief investigatory stops, are subject to the Fourth Amendment's reasonableness requirement, the first question before us is whether the continued interaction between Waycaster and Bowman following the completion of the traffic stop was a consensual encounter or a non-consensual seizure.

It is undisputed that the initial traffic stop was complete when Waycaster issued Bowman a warning citation, returned his license and registration, and shook his hand. It is likewise undisputed that Bowman subsequently agreed Waycaster could ask him additional questions, which Waycaster did for approximately 40 seconds. Thus, Bowman concedes that this 40-second colloquy in the patrol car was a consensual encounter. However, he maintains that this brief consensual encounter became a seizure for Fourth Amendment purposes at the moment that Waycaster directed him to "hang tight" in the patrol car while Waycaster questioned Alvarez.

An individual is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty." *Terry*, 392 U.S. at 19 n.16. To determine whether a seizure has occurred, we ask "whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the

encounter.'" *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (quoting

*Bostick*, 501 U.S. at 438). Stated another way, we ask, in view of "all of the

circumstances surrounding the encounter, [whether] the police conduct would have

communicated to a reasonable person that he was not at liberty to ignore the police

presence and go about his business." *Bostick*, 501 U.S. at 437 (internal quotation marks

omitted).

The district court concluded that, "[u]nder the totality of the circumstances, a

reasonable person in Defendant Bowman's position would not have felt free to leave and

terminate the traffic stop after being directed by Trooper Waycaster to remain in the

patrol car while the officer questioned the passenger." J.A. 276. The court explained:

> After concluding the traffic stop and asking Defendant Bowman a couple of follow up questions about where he picked up Alvarez, Trooper Waycaster inform[ed] Defendant Bowman that he [was] going to question Alvarez and direct[ed] Defendant Bowman to remain in the patrol car. Unlike when Trooper Waycaster plainly and unequivocally ask[ed] Defendant Bowman for permission to pat him down for weapons and to ask him a few follow up questions, Defendant Bowman [was] not given an opportunity to decline Trooper Waycaster's request to extend the stop so that he c[ould] question Alvarez. Trooper Waycaster direct[ed] Defendant Bowman to stay in the patrol car while he questioned Alvarez. At no point d[id] Trooper Waycaster tell Defendant Bowman that he [was] free to leave or even imply that Defendant Bowman could decline to remain in the patrol car while Trooper Waycaster question[ed] Alvarez. In fact, Trooper Waycaster even testified that Defendant Bowman was *not* free to leave at that time and that he could not have gotten out of the patrol car, terminate[d] the encounter, and [left] the scene.

J.A. 275-76.

In its brief, the government argues Bowman consented to the prolonged traffic

stop because he responded with the word "okay" after Waycaster stated to Bowman, "I

am going to ask [Alvarez] a question if you don't mind, ok?" Immediately thereafter, as Waycaster began getting out of the patrol car, he told Bowman to "just hang tight right there, ok?" The government emphasizes that when this exchange occurred, Waycaster had already returned Bowman's license and registration, used no physical force and made no overt displays of authority. Thus, the government in its brief surmises that any reasonable person would have felt free to terminate the encounter.[3]

The "reasonable person standard is an objective one, thus its proper application is a question of law" that we review *de novo*. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (internal quotation marks omitted). That Waycaster technically phrased his statement to Bowman in the form of a question is not determinative on the issue of consent. As this court has observed, although "[a] request certainly is not an order," a

---

[3] At oral argument, the government conceded that a seizure had occurred at the point that Trooper Waycaster directed Bowman to hang tight, but then characterized it as a "consensual seizure." This phrase seems oxymoronic, given that a "seizure" triggering Fourth Amendment scrutiny occurs only when governmental actors have, "by means of physical force or show of authority . . . in some way restrained the liberty of a citizen," *Terry v. Ohio*, 392 U.S. 1, 19 n.16, such that a reasonable person would not feel free to terminate the encounter. Quite the opposite is true of a consensual encounter, wherein a reasonable person would feel free to terminate questioning and depart. *See United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998). Nonetheless, it appears that this court has previously referred to "consensual seizures" in certain specific, limited circumstances. *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (holding that even if driver's encounter with armed guards at CIA headquarters constituted a seizure, "that seizure was consensual and thus reasonable" where the driver was seeking to enter the secure CIA facility). To the extent that any non-semantic differences exist between a "consensual seizure" and a consensual encounter where a suspect has given consent to a trooper to prolong a traffic stop, we need not do a deep dive on these issues now. For our purposes, the question is whether a consensual encounter followed the conclusion of Waycaster's additional questions to Bowman and Waycaster's directive to Bowman that he "hang tight."

15

request from an officer "that conveys the requisite show of authority may be enough to make a reasonable person feel that he would not be free to leave." *Id.* at 303 (internal quotation marks omitted). Here, Bowman was still seated in the patrol vehicle when Waycaster told him to "just hang tight." As the district court noted, Waycaster said this *as he was exiting* the patrol car and Bowman "[was] not given an opportunity to decline Trooper Waycaster's request to extend the stop so that he c[ould] question Alvarez." J.A. 275. In other words, Waycaster was not asking Bowman a question, as is evident from the fact that he did not wait for Bowman to respond or consent. Indeed, Waycaster testified at the hearing that at this point—before he questioned Alvarez—he had developed sufficient reasonable suspicion to detain Bowman and that Bowman was, in fact, "not free to get out of that police car to leave." J.A. 164.

A law enforcement officer need not always "display an intimidating demeanor or use coercive language" for a suspect to believe he cannot decline an officer's requests or otherwise terminate the encounter. *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). For example, the Sixth Circuit in *Richardson* concluded that a reasonable person in the defendant's position would not have felt free to ignore an officer's request where the officer's demeanor was not threatening and, after completing the traffic stop, the officer simply said "Okay, just hang out right here for me, okay?" *Id.; see also United States v. Beauchamp,* 659 F.3d 560, 569 (6th Cir. 2011) ("[J]ust as when an officer follows someone and stops him to 'ask' for identification, or to 'ask' him to exit his vehicle," a suspect's encounter with an officer "does not lose its coercive character simply because [the officer] . . . 'asked' for [the suspect's] compliance as opposed to

16

'ordering' it. Such a distinction is purely semantic."). Similarly, under these circumstances in this case, a reasonable person would have understood that he was no longer free to terminate the exchange—just as Trooper Waycaster himself understood it. As the district court pointed out, Waycaster was not asking a question when he instructed Bowman to "just hang tight right there, ok?"—Bowman was seated inside the patrol car and Waycaster made the statement as he was exiting the vehicle, suggesting that he was neither expecting nor interested in a reply from Bowman. In sum, we conclude that when Waycaster directed Bowman to remain in the patrol car after asking the additional questions, the encounter was no longer a consensual one but instead constituted a non-consensual seizure.

## B. Reasonable Suspicion

### 1.

Having concluded that Bowman did not consent to Waycaster's prolonging the vehicle stop after completing all tasks related to the traffic infraction and asking Bowman a few additional questions, we now turn to the question of whether the prolonged seizure was justified by reasonable suspicion. *See United States v. Palmer*, 820 F.3d 640, 649-50 (4th Cir. 2016) ("[A]n officer cannot investigate a matter outside the scope of the initial stop unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity.").

Although "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible," *Ornelas*, 517 U.S. at 695, "the precedents of the Supreme Court and this circuit suggest several principles that should animate any judicial evaluation of an

17

investigatory detention pursuant to *Terry*." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). To show the existence of reasonable suspicion, "a police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." *Id.* at 337 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "Reasonable suspicion is a commonsense, nontechnical standard," *Palmer*, 820 F.3d at 650 (internal quotation marks omitted), "that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Ornelas*, 517 U.S. at 695 (internal quotation marks omitted). In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of "the practical experience of officers who observe on a daily basis what transpires on the street." *Branch*, 537 F.3d at 336–37 (internal quotation marks omitted). The reasonable suspicion standard is less demanding than the probable cause standard or even the preponderance of evidence standard. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

Under these same principles, however, "the relevant facts articulated by the officers and found by the trial court, after an appropriate hearing, must 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Williams*, 808 F.3d at 246 (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)). It is not necessary that every fact articulated by the officer "*on its own* eliminate every innocent traveler," *McCoy*, 513 F.3d at 413, but "the totality of the circumstances of each case" must

18

demonstrate that the "detaining officer has a particularized and objective basis for suspecting legal wrongdoing," *Williams*, 808 F.3d at 246.

2.

The district court concluded that several factors articulated by Waycaster, taken together, established a "particularized and objective basis for suspecting . . . that Defendant Bowman was engaged in criminal activity," and provided the justification required to "extend[] the traffic stop in order to question Alvarez" about where he and Bowman had been that evening. J.A. 278 (internal quotation marks omitted). Those factors included the following: (a) Bowman's and Alvarez's apparent nervousness; (b) the presence of a suitcase, clothes, food and an energy drink inside of the Lexus; (c) Bowman's inability to supply Waycaster with the name and address of Alvarez's girlfriend; and (d) Bowman's statements that he had been laid off recently and that he had recently purchased the Lexus via Craigslist.

Perhaps recognizing that when viewed individually, each of the foregoing factors was hardly suspicious, the government suggests that an analysis of reasonable suspicion is "not amenable" to consideration of each factor in isolation. Brief of Appellee at 28. It is true "that our inquiry must account for the 'totality of the circumstances,' rather than employ a 'divide-and-conquer analysis.'" *Williams*, 808 F.3d at 247 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). But in considering whether the factors articulated by a police officer amount to reasonable suspicion, this court "will separately address each of these factors before evaluating them together with the other circumstances of the traffic stop." *United States v. Powell*, 666 F.3d 180, 187–88 (4th

19

Cir. 2011); *see Williams*, 808 F.3d at 247-53 (considering each factor alone, at length, before considering the factors together with the totality of circumstances).

a. Nervousness

According to Waycaster, both Bowman and Alvarez appeared to be nervous. Waycaster based this conclusion on several observations. Waycaster noticed that Bowman's hands were shaking as he handed over his vehicle registration and driver's license after the initial stop; that when Waycaster initially approached the car, Alvarez stared straight ahead instead of looking him in the eye; that in both men "the carotid artery was beating very hard and rapidly," J.A. 140, signaling an increased heart rate and nervousness; and that Bowman "couldn't sit still" in the patrol vehicle while Waycaster was processing his license and registration, J.A. 156.

As this court has recognized on multiple occasions, "a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *Palmer*, 820 F.3d at 652-53 n.7. Although "nervous, *evasive* behavior" is relevant to the determination of reasonable suspicion, *Wardlow*, 528 U.S. at 124 (emphasis added) (holding officers had reasonable suspicion to stop suspect who fled upon seeing the police), mere nervousness "is of limited value to reasonable suspicion analyses," *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011) (internal quotation marks omitted). As this court explained in *Massenburg*,

> [i]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity. Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion.

20

*Id.* (alteration omitted) (quoting *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998)); *see Richardson*, 385 F.3d at 630 (explaining nervousness "is an unreliable indicator, especially in the context of a traffic stop").

With respect to Waycaster's specific observations regarding nervousness, none suggest that Bowman or Alvarez exhibited signs of nervousness above the norm. As for Waycaster's testimony that Bowman's hands were trembling when he handed over his license and registration, the government, in its response to Bowman's motion to suppress, conceded that Bowman's nervousness subsided and he appeared and sounded calm for the remainder of the traffic stop. *Cf. United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011) ("[T]he district court understandably discounted" the suspect's trembling hands "because, as the video reveals, Digiovanni appeared calm and cooperative throughout the encounter."), *abrogated in part on other grounds by Rodriguez v. United States*, 135 S. Ct. 1609 (2015); *United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (finding support for reasonable suspicion based on testimony that defendant "was sweating and unusually nervous when interacting with [law enforcement], and [defendant's] nervousness did not subside, as occurs normally, but became more pronounced as the stop continued"). This concession is supported by the dashcam video of the traffic stop.

Waycaster also testified that he was able to see the carotid artery on both men pulsing, which Waycaster interpreted as a show of anxiety. Waycaster acknowledged he had not received any medical training other than basic First Aid and admitted that there were numerous other explanations for a pulsing carotid artery, such as a medical

21

condition, but indicated the significance of the carotid artery "is pretty common visual knowledge." J.A. 142. Waycaster also admitted that the energy drink he noticed in the car—and considered suspicious—could have caused an elevated heart rate or shaky hands since energy drinks typically contain large amounts of caffeine. In the past, this court has determined that "heavy breathing, heavy sweating, and pulsating of the carotid artery" supported a finding of reasonable suspicion. *United States v. Foreman*, 369 F.3d 776, 784 (4th Cir. 2004). In *Foreman*, the officer testified he noticed the suspect's "carotid artery on his neck throbbing *more noticeably than the thousands of people* that [the officer] had stopped in the past." *Id.* at 778 (emphasis added; internal quotation marks omitted). By contrast, Waycaster testified that he had seen similar "pulsing other times within the last year." J.A. 142. Waycaster did not explain how his observation of the carotid arteries in this case demonstrated nervousness beyond the norm, *see Massenburg*, 654 F.3d at 490, particularly in light of how calm Bowman appeared and sounded in the video recording of the traffic stop.

Waycaster also found that Alvarez's failure to make eye contact with him after he first pulled over the Lexus was a sign of nervousness. There is nothing intrinsically suspicious or nefarious about the occupant of a vehicle not making eye contact with an officer during a traffic stop. "Given the complex reality of citizen-police relationships . . . , a young man's keeping his eyes down during a police encounter seems just as likely to be a show of respect and an attempt to avoid confrontation." *Massenburg*, 654 F.3d at 489. In fact, the government in other cases has argued "just the reverse: that it is suspicious when an individual looks or stares back at officers." *Id.* (alteration and

22

internal quotation marks omitted). Waycaster did not explain why this behavior was suggestive of criminal misbehavior other than to label it "suspicious." This observation, therefore, is not particularly probative of a suspect's nervousness. *See Williams*, 808 F.3d at 246 ("To support a finding of reasonable suspicion, we require the detaining officer to . . . articulate why a particular behavior is suspicious . . . ." (internal quotation marks omitted)).

Finally, as additional proof of Bowman's nervousness, Waycaster testified that Bowman was unable to remain still while he sat in the patrol car and waited for Waycaster to finish checking his license and registration. Although the interaction between Waycaster and Bowman once they entered the patrol car could be heard on the video recording, Bowman's movements in the patrol car were not captured by the forward-facing video recorder. Waycaster did not describe at the hearing how Bowman was moving or explain why his movement was suspicious, and he did not make any comments on the video recording to indicate he thought Bowman was moving around in an unusual or suspicious manner. Like the others, this factor alone does not support a finding of reasonable suspicion.

b. Clothes, Food and an Energy Drink in the Lexus

Waycaster stated that several items in the car caught his attention: an energy drink, food and food wrappers, a suitcase and some loose clothing. As the government concedes in its brief, the presence of these items in a vehicle, without more, is utterly unremarkable. "[T]he mere presence of fast-food wrappers in [a suspect's vehicle] is entirely consistent with innocent travel such that, in the absence of contradictory

23

information, it cannot reasonably be said to give rise to suspicion of criminal activity." *United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998). Waycaster suggested these items indicated that Bowman and Alvarez "could have been possibly traveling for a longer period of time" than indicated by Bowman, J.A. 91, who told Waycaster that he was on his way home after having picked up Alvarez about 30 minutes earlier. Of course, Waycaster also stated that the items could simply be indicative of a messy person and nothing more. Likewise, the presence of the suitcase and clothing could have been satisfactorily explained by Bowman's statement to Waycaster that although he lived in Black Mountain, Bowman had been staying at his girlfriend's house in Fletcher, which was a 20-minute drive from Black Mountain.

Even if the presence of these items somehow suggested that Bowman had not been truthful about the amount of time he and Alvarez had been traveling, the government failed to connect it to any wrongdoing in this case. Although "false statements can be considered in establishing reasonable suspicion," "a false statement, without more, will typically be insufficient." *Powell*, 666 F.3d at 188–89. The government "neither apprised [us] of what, if any, significance such a falsehood normally has in the illicit drug trade, nor what inferences" Waycaster drew from his belief that Bowman had not been truthful about how long he had been traveling. *United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991).

c. Bowman's uncertainty about the address of Alvarez's girlfriend

The district court concluded that Bowman's inability to recall where Alvarez's girlfriend lived even though he claimed to have picked Alvarez up from there 30 minutes

24

earlier "added to Trooper Waycaster's suspicion." J.A. 277. However, as is clear from the video recording of the traffic stop, Bowman told Waycaster several times that the address had been entered into his car's on-board GPS as he was unfamiliar with the area. Over the course of the traffic stop, Waycaster asked Bowman a number of times to explain where he had picked up Alvarez, and Bowman gave the same response—he was uncertain but the address could be found in his GPS on the screen in his car. Despite his suspicions, Waycaster never attempted to examine the GPS to verify that an address had been entered. Once again, the government fails to explain *why* Bowman's responses in this regard caused him to be suspicious that Bowman was mixed up in criminal drug activity, rather than having simply picked up a friend in the dark, and in an area with which he was unfamiliar. Under those circumstances, it would be perfectly consistent with innocent travel for a person to rely on a GPS system to navigate and still not know precisely where he had been.[4]

d. Bowman's vehicle purchases

Finally, while Bowman was seated in the patrol car waiting for Waycaster to complete the checks associated with the traffic stop, Bowman implied that the weaving observed by Waycaster was a result of problems Bowman was having with the front end of the Lexus, which Bowman volunteered he had recently purchased. In response to questions from Waycaster, Bowman stated that he was a welder and fabricator but that he

---

[4] The government likewise points out that Bowman did not know the name of Alvarez's girlfriend. Again, we are left to wonder why this fact, coupled with his inability to recall a location from memory, suggests criminal wrongdoing to Waycaster.

was presently laid off from work, and he identified the company. Bowman explained that he had one prior speeding ticket while using a different vehicle which he had purchased through Craigslist. Bowman indicated the Lexus was a 1998 model and stated that he bought cheap cars from Craigslist. Waycaster found two aspects of this information suggestive of Bowman's involvement in criminal activity. First, the fact that Bowman had been laid off but was still able to purchase "multiple vehicles in a short period of time," J.A. 154, struck Waycaster as suspicious. Second, Waycaster thought it highly suspicious that Bowman "was in possession of one car and admitted he recently bought another car off of Craigslist" because "[i]t's a known practice with narcotics traffickers to either use rental vehicles or use multiple, different vehicles, or buy and sell vehicles to transport narcotics." J.A. 101.

(1)

Regarding Bowman's purported purchase of "multiple vehicles in a short period of time," J.A. 154, Waycaster, first and foremost, seems to have made some unsubstantiated assumptions. Bowman only stated that he purchased the 1998 Lexus recently and that he buys cheap cars off of Craigslist. He did not state that he had *recently* purchased the other car he was driving when he received the speeding ticket. In fact, Waycaster did not ask and therefore did not know whether Waycaster had purchased the Lexus before or after the layoff, or how much Bowman paid for his then 18-year-old Lexus. Waycaster simply reasoned that, because Bowman was laid off, he had no means of purchasing a used car through Craigslist. At the hearing, Waycaster wondered, "[i]f he's currently laid off, where is he getting the money? Because . . . I work every day and I don't have the

26

money to buy multiple vehicles in a short period of time." J.A. 154. Trooper Waycaster was assuming he and Bowman were in identical financial situations, apparently unable to conceive of numerous possible explanations—maybe Bowman has saved enough money while he was working to purchase an 18-year-old car, or maybe he had a family member provide him the funds. The Tenth Circuit rejected a similar argument in *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), involving the traffic stop of an unemployed painter. The court disagreed that reasonable suspicion was supported by the district court's underlying assumption that it was "unlikely or implausible that an unemployed painter in Kansas could afford to take a two-week vacation in California." *Id.* at 946. The court explained that "temporary unemployment does not mean that vacations are financially unattainable. [Defendant] may have saved money for the trip; he may have been the donee of a wealthy relative or acquaintance; he might have won the lottery or not yet exceeded the credit line on his VISA card." *Id.* at 947. So too here. Without more, this factor is totally innocuous, and we accord very little weight to it.

(2)

Waycaster indicated that "[i]t's a known practice [of] narcotics traffickers to either use rental vehicles or use multiple, different vehicles, or buy and sell vehicles to transport narcotics." J.A. 101. The district court adopted this factor as supporting reasonable suspicion that Bowman was engaged in criminal activity. Undoubtedly, some drug traffickers, in order to further their illicit activity and make it harder to detect, use multiple vehicles which they may buy cheap through Craigslist. Surely, however, a far greater number of innocent travelers also use multiple vehicles, some of which they

27

purchase from Craigslist sellers. This factor, standing alone, is likewise entitled to little weight. *See Williams*, 808 F.3d at 247 (accepting "as a general proposition, [that] some drug traffickers use rental cars" but holding that defendants' use of a rental car "is of minimal value to the reasonable-suspicion evaluation" because "the overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes").

### 3. Totality of the Circumstances

Standing alone, none of the foregoing factors provides a basis for a reasonable, articulable suspicion that Bowman was engaged in criminal activity. Nonetheless, we still must consider all of the factors together, given that "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." *McCoy*, 513 F.3d at 413-14. This court "must look at the cumulative information available to the officer," rather than hold a "stop unjustified based merely on a piecemeal refutation of each individual fact and inference." *Branch*, 537 F.3d at 337 (internal quotation marks omitted). In this case, even combining all of the factors identified by the government and the court below and viewing them in light of all the other facts and circumstances of this case, we perceive no basis for a reasonable suspicion that Bowman was involved in criminal activity. "Under the applicable standard, the facts, in their totality, should eliminate a substantial portion of innocent travelers." *Williams*, 808 F.3d at 251 (internal quotation marks omitted). The factors present in this case do not. The fact that Bowman was driving a messy, 18-year-old car he purchased on Craigslist, even when viewed with all the other circumstances, is not indicative of criminal activity. Waycaster's law

28

enforcement experience that drug traffickers "use multiple, different vehicles to transport narcotics," J.A. 277, also does not aid the government, as nothing in the record supports the notion that Bowman was using *multiple* cars simultaneously. The fact that Bowman appeared to be nervous initially adds little, given that law-abiding drivers commonly experience nervousness during a traffic stop. And, even combined with all of the other circumstances, Bowman's alleged evasiveness about the where he had picked up Alvarez likewise would not tip the balance in favor of reasonable suspicion given that Bowman told Waycaster he was not familiar with the area but that Waycaster could see the location by looking at Bowman's GPS unit.

Finally, even if the totality of the circumstances here could have been viewed as vaguely suspicious, the government has failed to articulate why Bowman's "behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Williams*, 808 F.3d at 251 (internal quotation marks omitted). Although the nature of the totality-of-the-circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is "impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." The government has failed to identify any such concrete reasons.

IV.

For the foregoing reasons, we hold that Trooper Waycaster lacked reasonable suspicion to extend an otherwise-completed traffic stop, leading ultimately to the execution of a dog-sniff and the recovery of methamphetamine, digital scales and ammunition. We conclude that Bowman's motion to suppress should have been granted.

29

Accordingly, we vacate Bowman's conviction and remand the case for further proceedings as are consistent with this opinion.

*VACATED AND REMANDED*