**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 25-1729**

_____

JAMES BROWN, III,

　　　　Plaintiff – Appellant,

v.

LEON LOTT, as Representative for the Richland County Sheriff's Department; OFFICER CHRIS S. COWAN, individually and in his official capacity; TIYANA HENLEY, individually and in her official capacity with Richland County Recreation Commission,

　　　　Defendants – Appellees.

_____

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Sherri A. Lydon, District Judge.  (3:24−cv−00007−SAL)

_____

Submitted:  February 24, 2026                    Decided:  April 28, 2026

_____

Before WILKINSON, HARRIS, and BENJAMIN, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Judge Benjamin joined.

_____

**ON BRIEF:**  Pheobe A. Clark, WUKELA LAW FIRM, Florence, South Carolina, for Appellant.  Andrew F. Lindemann, LINDEMANN LAW FIRM, P.A., Columbia, South Carolina; Robert D. Garfield, Steven R. Spreeuwers, GARFIELD SPREEUWERS LAW GROUP, LLC, Columbia, South Carolina, for Appellees Leon Lott and Chris S. Cowan.

Eugene H. Matthews, Chandra A. Stallworth, RICHARDSON PLOWDEN & ROBINSON, P.A., Columbia, South Carolina, for Appellee Tiyana Henley.

———————————

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

James Brown was indicted for misconduct in office. Shortly afterward, he approached a former coworker, Tiyana Henley, and asked in an allegedly threatening manner if she was cooperating with the government. When Henley answered "yes," Brown acknowledged that he could not speak to her, told her to leave his brother alone, and left. That prompted a Richland County law enforcement officer, Chris Cowan, to pull Brown over and seek a warrant for his arrest. Brown was charged with witness intimidation.

Years later, this charge was dropped. Brown then sued Cowan, Henley, and a representative of the Richland County Sheriff's Department, taking issue in relevant part with Cowan's traffic stop and warrant affidavit. But Cowan properly executed the former and properly drafted the latter, even when viewing the record in the light most favorable to Brown. We thus affirm the district court's grant of summary judgment for the defendants.

I.

For six or seven years, Brown worked as the executive director of the Richland County Recreation Commission ("RCRC"). That ended upon his termination in October 2016, when he was indicted for "us[ing] his position" at the RCRC "to coerce and attempt to coerce female employees into having sexual contact with him." J.A. 231. The next day, the FBI and state police interviewed Brown about these allegations for several hours.

As Brown saw things, "there was a campaign by various people against the members of [his] family to target . . . and hurt them." J.A. 213. One of those people, in his mind, was Henley. Specifically, Brown knew Henley had earlier reported his brother to RCRC human resources for taking pictures of her during a board meeting.

3

So the day after law enforcement's interrogation, Brown drove to an RCRC tennis center. Henley, who was then on site, saw Brown's car and promptly asked a coworker to call the authorities. According to Henley, Brown had been "coming after everyone cooperating in [the government's] investigation," and she "kn[ew] him to carry a gun." J.A. 131. She also had a special cause for concern: before Brown's indictment, Henley gave the FBI an eight-page statement alleging that he had targeted her numerous times for sexual exploitation.

Brown exited his car, entered the tennis center, and approached Henley. In Henley's words, Brown "came as close to [her] desk as possible" and, in "a rattling tone as an angry person may have," asked if she was cooperating with the government. J.A. 131. When Henley answered in the affirmative, Brown acknowledged he could not talk to her but added that she "need[s] to leave [his brother] alone." J.A. 131. Henley replied that his brother needed "to leave [her] alone," pointing out that Brown had been hearing only one side of the story. J.A. 131. After reiterating how he could not "say anything to [Henley]" because she was a cooperating witness, Brown returned to his car and drove off. J.A. 131.

Meanwhile, an RCRC employee notified of the incident, Tara Dickerson, called Cowan. (The two had worked together in the past, and Cowan was familiar with Brown's investigation by the FBI.) In a "very agitated" tone, she told the officer that Brown visited the tennis center despite being instructed by his attorney to keep off RCRC property. J.A. 238. Dickerson said that she did not want Brown there due to the safety risk that he posed to employees.

4

In response, Cowan attests that he first drove to the tennis center and spoke with Henley about her encounter with Brown. Brown, for his part, says that no such conversation occurred. Either way, Cowan proceeded to patrol the area around the tennis center. He found Brown a few blocks away and pulled him over. Upon the officer's questioning, Brown confirmed he had been at the tennis center and personally interacted with Henley. Brown also disclosed that he had a firearm in his car as well as a concealed weapons permit. At some point, Cowan asked Brown to get out of his car. After roughly six minutes, however, Brown left with Cowan's permission.

Several hours later, Henley gave a sworn statement to a different officer, reaffirming her narrative of the encounter with Brown detailed above. Cowan then secured a warrant for Brown's arrest. To do so, the officer drafted an affidavit describing how Brown had "approached the victim" (Henley, who was unnamed) "and other employees in a threatening manner and while knowing that he could not speak with them" due to his indictment. J.A. 136. The affidavit also recounted how Brown got "as close as possible" to Henley and asked "in a threat[e]ning tone" about her cooperation with the government. J.A. 136. It added that she knew Brown "normally carries a handgun" and that police later found a weapon in his vehicle upon "stopp[ing] him a short distance away." J.A. 136. Finally, the affidavit explained that Henley gave the authorities a sworn statement and that Cowan "and others are witness[es] to prove the same." J.A. 136.

Based on this information, a magistrate judge issued the warrant. Brown was correspondingly arrested and charged with witness intimidation. *See* S.C. Code Ann. § 16-

5

9-340(A)(1). When Brown was acquitted of misconduct years later, however, the state dropped this accompanying charge.

Brown then sued Cowan, Henley, and a representative of the Richland County Sheriff's Department, alleging violations of his constitutional rights under 42 U.S.C. § 1983 as well as state law claims for false arrest; abuse of process; malicious prosecution; negligence; and negligent hiring, training, and supervision. The defendants moved for summary judgment as to every claim, which the district court granted upon a magistrate judge's recommendation. Brown appealed.

## II.

Charitably understood, Brown raises three claims on appeal: Cowan pulled him over without a reasonable suspicion of criminal wrongdoing, Cowan's affidavit recklessly or intentionally misrepresented facts to artificially create probable cause, and the district court's decision was marred by reversible bias because the docket for his case mislabeled him a prisoner.

## A.

Start with the traffic stop. In conclusory fashion, Brown's briefing asserts that Cowan lacked the requisite reasonable suspicion to pull him over. Assuming this minimal effort suffices to preserve the argument, it fails on the merits.

Consistent with the Fourth Amendment, a police officer may conduct a *Terry* stop when he develops a reasonable suspicion, based on "specific and articulable facts," of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Cowan developed just that. He knew, for instance, that Brown had been indicted for allegedly using his position to coerce

6

coworkers into sex. He also knew that Brown was a gun owner and had been asking RCRC employees if they were witnesses against him. And he knew that Brown had recently visited the tennis center to continue confronting his former peers.

Not only are these facts specific and articulable, but they also came from the FBI's investigation of Brown and from Dickerson, someone who "never had any issues" regarding credibility in her prior interactions with Cowan. J.A. 241; *see Adams v. Williams*, 407 U.S. 143, 146 (1972). And crucially, Brown disputes none of this information. Cowan thus had a reasonable basis to suspect that Brown was "by threat . . . intimidat[ing] or imped[ing] a . . . witness . . . in the discharge of h[er] duty as such." S.C. Code Ann. § 16-9-340(A)(1).

Cowan's *Terry* stop was "reasonably related in scope," as well. *Terry*, 392 U.S. at 20. Over the course of roughly six minutes, Cowan asked Brown about his recent whereabouts, his interactions with Henley, and his possession of a firearm—all of which rationally pertained to the basis for Cowan's reasonable suspicion. The officer also asked Brown to exit his car, a safety measure categorically permitted during lawful traffic stops. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (per curiam).

That Brown was ultimately not convicted of witness intimidation makes no difference; a *Terry* stop needs only "a minimal level of objective justification," which is "a less demanding standard than probable cause" and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Although Brown believes he did nothing wrong, even "individually innocuous factors" can "add up to a reasonable suspicion." *United States v. Bowman*, 884 F.3d 200, 219 (4th Cir. 2018).

Undeterred, Brown casts doubt upon the alleged conversation between Cowan and Henley. Recall how Cowan attests that, right before pulling Brown over, he questioned Henley to get her side of the story. According to Brown, this never happened. For support, he points to Henley's deposition testimony that she did not remember speaking with Cowan, as well as some evidence suggesting that just sixteen minutes elapsed between Dickerson's call to police and Cowan's traffic stop.

But these are not the smoking guns that Brown makes them out to be. To reiterate, Cowan developed a reasonable suspicion that Brown was engaging in witness intimidation after speaking with Dickerson and the FBI—interactions that Brown does not contest happened—but *before* speaking with Henley. This renders the officer's purported conversation with Henley superfluous to the lawfulness of his *Terry* stop. Moreover, Brown's inference that Cowan never spoke with Henley strikes us as far-fetched. Just because Henley testified that she could not remember a short conversation from more than eight years earlier does not mean it never happened. And sixteen minutes could have sufficed for Cowan to drive to the tennis center, briefly speak with Henley, and then execute a traffic stop just a few blocks away.

## B.

Turn next to Cowan's warrant affidavit. As Brown sees things, the officer misrepresented and excluded relevant information to such a degree that he violated the Fourth Amendment. Here too, we disagree.

In general, "the fact that a neutral magistrate has issued a warrant," like in this case, "is the clearest indication that the officers acted in an objectively reasonable manner."

8

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). However, an arrestee can still demonstrate a Fourth Amendment violation by showing that, without the "false material" caused by the affiant's "perjury or reckless disregard," the affidavit would have been "insufficient to establish probable cause." *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

"This exception covers lies by omission, too." *United States v. Glass*, 160 F.4th 563, 569 (4th Cir. 2025). If an affidavit "omitted material facts that when included would defeat a probable cause showing," and if "the omission was designed to mislead or was made with reckless disregard of whether it would mislead," then the affiant violated the arrestee's Fourth Amendment rights. *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008).

With these standards in mind, consider first Cowan's affidavit as written. It recites how Brown, despite knowing he could not speak with RCRC workers due to his criminal investigation, approached an unnamed employee in an intimidating manner to ask if she was cooperating with the government. The affidavit adds that the employee knew Brown often carried a firearm and that Brown was found nearby with a weapon in his car. It also specifies that the employee gave authorities a sworn statement and that several witnesses, including Cowan, back up her story.

This information is "detailed and specific." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). It explains how the victim herself supported the contents of the affidavit, doing so under oath no less. *See Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991). And it states that other witnesses, including the affiant, corroborate her story. *See Escalera v. Lunn*, 361 F.3d 737, 747 (2d Cir. 2004). The affidavit thus gave enough "reasonably trustworthy information . . . to warrant a prudent man in believing that [Brown] had

9

committed or was committing [witness intimidation]." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Against all this, Brown mainly laments how the affidavit did not explicitly state that he stopped talking to Henley immediately after she confirmed that she was a cooperating witness. In so doing, however, he fails to explain why Cowan's omission of this detail amounted to "perjury or reckless disregard." *Franks*, 438 U.S. at 156. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). And this detail would not have defeated probable cause regardless. That is, the so-called corrected affidavit would have still recounted how Brown, a known gunowner then under criminal investigation, approached Henley "as close as possible" to ask "in a threat[e]ning tone" about her cooperation with the government. J.A. 136. Based on the totality of the circumstances, Brown's conduct sufficed to generate probable cause that he by threat intimidated Henley, a witness to his investigation, even if he ended the conversation upon learning of her cooperation.

The same goes for Brown's oblique criticism that Cowan mischaracterized things by writing that Brown approached Henley "while knowing that he could not speak with [her]." J.A. 136. As above, Brown gives us no reason to think Cowan included this purported falsehood intentionally or recklessly. And as above, its inclusion did not change the probable cause calculus facing the magistrate judge. Even if the affidavit had not included this line, it would still have stated Brown was "aware of the criminal investigation against him" for misconduct in office, J.A. 136—an awareness that Brown does not and

10

could not contest, since he spoke to the police for hours the day before. This awareness alone would have given him the intuition that he could not speak with former coworkers, especially since his own lawyer apparently told him to stay away from RCRC property.

No more availing is Brown's allegation that Cowan embellished the contents of his affidavit. On this score, Brown takes issue with some of the affidavit's language, such as how it refers to Henley as a "victim" and describes how Brown approached her "as close as possible" with "a threat[e]ning tone." J.A. 136. The problem for him, however, is that this language all accurately portrays Henley's story under oath. Indeed, many of the at-issue phrases derive verbatim from her sworn statement. *See* J.A. 131. Though Brown may dispute the accuracy of this narrative, he has not even tried to argue *Cowan thought* Henley was exaggerating things or had substantial doubt as to her honesty. That dooms Brown's claim; again, he must "identify intentionality or reckless disregard *on the part of the affiant.*" *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021) (emphasis added).

All that remains is Brown's theory that the conversation between Cowan and Henley never happened. For the same reasons as in our *Terry* stop analysis, we doubt the record warrants an inference favoring Brown on this front. And there is an even bigger problem: Brown concedes that Henley gave a sworn statement to police, and he does not contest that Cowan knew about this statement at the time he drafted his affidavit. Further, as already explained, every detail in his affidavit about the encounter between Henley and Brown finds support in the sworn statement. Accordingly, if Cowan did not question Henley firsthand, her statement under oath alone provided enough of a basis for the officer's subsequent affidavit to comport with the Fourth Amendment.

11

C.

Brown's last challenge sounds in principles of due process. The docket below designates the "Nature of Suit" as "550 Prisoner: Civil Rights." J.A. 1. In reality, Brown was never convicted, let alone imprisoned, for his conduct at issue. According to Brown, this mislabeling signals implicit bias against him, depriving him of the right to a fair adjudication.

This contention needs little response. We recognize that the docket seems to mislabel Brown's case. But this (presumably clerical) error does not come close to tainting "the appearance" or "reality of impartial justice" such that the Constitution would demand reversal. *Williams v. Pennsylvania*, 579 U.S. 1, 16 (2016). Nature-of-suit codes serve statistical and recordkeeping purposes; they do not affect dispositions of cases. *See* Christina L. Boyd & David A. Hoffman, *The Use and Reliability of Federal Nature of Suit Codes*, 2017 Mich. St. L. Rev. 997, 1000–01. And sure enough, neither the district court nor the magistrate judge here ever so much as alluded to Brown as a prisoner. Indeed, the sole case that Brown tenders in support of his claim lands far afield from the facts of his appeal. *See United States v. Liggins*, 76 F.4th 500, 506, 509 (6th Cir. 2023) (vacating conviction after district court made "many disparaging remarks about [the defendant]," such as how he "look[ed] like a criminal").

III.

Brown's three-pronged challenge to the district court's judgment falls short at every step. Instead of revealing impropriety, the record shows that Cowan and the judges below complied with the Constitution. Seeing no error, we affirm.

12

*AFFIRMED*