IN THE SUPREME COURT OF NORTH CAROLINA

No. 365A16-2

Filed 28 February 2020

STATE OF NORTH CAROLINA

v.

DAVID MICHAEL REED

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 257 N.C. App. 524, 810 S.E.2d 245 (2018), on remand from this Court, 370 N.C. 267, 805 S.E.2d 670 (2017), reversing a judgment entered on 21 July 2015 by Judge Thomas H. Lock in Superior Court, Johnston County, following defendant's plea of guilty after the entry of an order by Judge Gale Adams on 14 July 2015 denying defendant's motion to suppress. Heard in the Supreme Court on 9 April 2019.

*Joshua H. Stein, Attorney General, by Kathleen N. Bolton, Assistant Attorney General, and Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant.*

*Paul E. Smith for defendant-appellee.*

MORGAN, Justice.

On 9 September 2014, a law enforcement officer stopped a rental car which was being driven along an interstate highway by the defendant, David Michael Reed. In the seminal case of *Terry v. Ohio*, the Supreme Court of the United States recognized that law enforcement officers need discretion in conducting their

investigative duties. 392 U.S. 1 (1968). Since *Terry*, this discretion has been judicially broadened, equipping law enforcement officers with wide latitude within which to effectively fulfill their duties and responsibilities. When complex considerations and exigent circumstances combine in a fluid setting, officers may be prone to exceed their authorized discretion and to intrude upon the rights of individuals to be secure against unreasonable searches and seizures under the Fourth Amendment. This case presents such a situation, as we find here that the law enforcement officer who arrested defendant disregarded the basic tenets of the Fourth Amendment by prolonging the traffic stop at issue without defendant's voluntary consent or a reasonable, articulable suspicion of criminal activity to justify doing so. As a result, we affirm the decision of the Court of Appeals.

**Factual and Procedural Background**

Defendant was indicted on 6 October 2014 on two counts of trafficking in cocaine for transporting and for possessing 200 grams or more, but less than 400 grams, of the controlled substance. On 27 April 2015, defendant, through his counsel, filed a motion to suppress evidence obtained during a traffic stop of a vehicle operated by defendant, which resulted in the trafficking in cocaine charges. During a suppression hearing which was conducted on 2 June 2015 and 4 June 2015 pursuant to defendant's motion to suppress, the following evidence was adduced:

At approximately 8:18 a.m. on 9 September 2014, Trooper John W. Lamm of the North Carolina State Highway Patrol was in a stationary position in the median

of Interstate 95 (I-95) between the towns of Benson and Four Oaks. Trooper Lamm was a member of the Criminal Interdiction Unit of the State Highway Patrol. In that capacity, he was assigned primarily to work major interstates and highways to aggressively enforce traffic laws, as well as to be on the lookout for other criminal activity including drug interdiction and drug activity. Trooper Lamm was in the median facing north in order to clock the southbound traffic, using radar for speed detection, when he determined that a gray passenger vehicle was being operated at a speed of 78 miles per hour in a 65 mile-per-hour zone.[1] The driver of the vehicle appeared to Trooper Lamm to be a black male. Trooper Lamm left his stationary position to pursue the vehicle. As he caught up to the vehicle, the trooper turned on his vehicle's blue lights and siren. The operator of the car pulled over to the right shoulder of the road, and Trooper Lamm positioned his law enforcement vehicle behind the driver.

Trooper Lamm testified that he stopped the driver of the vehicle for speeding. Defendant was the operator of the vehicle, which was a Nissan Altima. Upon approaching the vehicle from its passenger side, the trooper noticed that there was a black female passenger and a female pit bull dog inside the vehicle with defendant. Trooper Lamm obtained defendant's driver's license along with a rental agreement for the vehicle. Defendant had a New York driver's license. The rental agreement

---

[1] During the traffic stop, defendant admitted that his speed was 84 miles per hour.

-3-

paperwork indicated that a black Kia Rio was the vehicle which had been originally obtained, that there was a replacement vehicle, and that the renter of the vehicle was defendant's fiancée, Ms. Usha Peart. Peart was the female passenger in the vehicle with defendant. The vehicle rental agreement paperwork indicated that defendant was an additional authorized driver. The gray Nissan had not been reported to have been stolen.

After examining the rental agreement, Trooper Lamm requested that defendant come back to the law enforcement vehicle. The trooper inspected defendant for weapons and found a pocketknife, but in the trooper's view it was "no big deal." Trooper Lamm opened the door for defendant to enter the vehicle in order for defendant to sit in the front seat. Defendant left the front right passenger door open where he was seated, leaving his right leg outside the vehicle so that he was not seated completely inside the patrol car. Trooper Lamm asked defendant to get into the vehicle and told defendant to close the door. Defendant hesitated and stated that he was "scared to do that." He explained to the trooper that he had previously been stopped in North Carolina, but that he had never been required to sit in a patrol car with the door closed during a traffic stop. Trooper Lamm ordered defendant to close the door and stated, "[s]hut the door. I'm not asking you, I'm telling you to shut the door . . . Last time I checked we were the good guys." Defendant complied with Trooper Lamm's order and closed the front passenger door of the patrol car. It was at this point in the traffic stop that Trooper Lamm did not consider defendant to be free

to leave.

The trooper began to pose questions to defendant. Defendant told him that Peart and defendant were going to Fayetteville to visit family and to attend a party before school sessions officially resumed. Defendant was further questioned about his living arrangements with Peart, and whether he or Peart owned the dog in the car. When the trooper asked Peart about their destinations while she was still in the gray Nissan and defendant was in the patrol car, Peart confirmed that family members were in the area, and that she and defendant were going to Fayetteville, and also mentioned Tennessee and Georgia. Although the rental agreement paperwork only authorized the rental vehicle to be in the states of New York, New Jersey, and Connecticut and it was not supposed to be in North Carolina, the trooper determined that the vehicle was properly in the possession of Peart upon actually calling the rental vehicle company in New York.

Trooper Lamm characterized the rental vehicle as being "very dirty inside." It had a "lived-in look," according to the trooper, with "signs of like hard driving, continuous driving—coffee cups, empty energy drinks." There was a large can of dog food, a jar of dog food, and dog food scattered along the floorboard. There were also pillows, blankets, and similar items inside the vehicle.

After receiving confirmation from the rental vehicle company that all was sufficiently in order with the gray Nissan, Trooper Lamm completed the traffic stop by issuing a warning ticket to defendant. The trooper handed all of the paperwork

back to defendant—including defendant's driver's license, the vehicle rental agreement, and the warning ticket—and told defendant that the traffic stop was concluded. The traffic stop had already lasted for a duration of fourteen minutes and twelve seconds through the point in time that Trooper Lamm told Peart that "I just have to write Mr. Reed a warning, he just has to slow down, his license is good and then you'll be on your way." After this, the stop was lengthened for an additional five minutes during which Trooper Lamm communicated with the rental vehicle company. While the trooper did not know the time that the traffic stop concluded, he acknowledged that "it did take a little bit longer than some stops." Trooper Lamm testified that defendant was free to leave upon the completion of these actions; nonetheless, the trooper did not inform defendant that defendant was free to leave. Instead, the trooper said to defendant, "[t]his ends the traffic stop and I'm going to ask you a few more questions if it is okay with you." Trooper Lamm construed defendant's continued presence in the front passenger seat of the law enforcement officer's vehicle to be voluntary, testifying: "[h]e complied . . . [h]e stayed there." Trooper Lamm later said in his testimony that although he informed defendant that the traffic stop was completed, defendant would still have been detained and required to stay seated, even if defendant denied consent to search the rental vehicle and wanted to leave, based upon Trooper Lamm's observations. The trooper went on to testify that at the point that he went to get consent to search the vehicle from Peart, defendant was detained.

When defendant was asked by Trooper Lamm if there was anything illegal inside the vehicle and for permission to search it, the trooper testified that defendant responded, "you could break the car down," and did not give a response to the trooper's inquiry regarding permission to search the vehicle. Defendant instead directed Trooper Lamm to Peart on the matter of searching the vehicle, because she was the individual who had rented it. Trooper Lamm then told defendant to remain seated in the patrol car by instructing defendant to "sit tight." At this point, for safety reasons, the trooper once again would not have allowed defendant to leave the patrol car.

Trooper Kenneth Ellerbe of the North Carolina State Highway Patrol, like Trooper Lamm, was also a member of the Patrol's Criminal Interdiction Unit who was located in a stationary position elsewhere on I-95 in the median, facing northbound as he observed southbound traffic at about 8:30 a.m. Trooper Ellerbe was contacted by Trooper Lamm to meet at the traffic stop in which Trooper Lamm was involved, because the Criminal Interdiction Unit operates in such a manner that a trooper who suspects criminal activity in a traffic stop needs another trooper to provide some security in the event that the investigating trooper eventually searches the vehicle at issue if consent to search is obtained. Trooper Ellerbe proceeded to Trooper Lamm's location, parked behind Trooper Lamm's vehicle to the right off the shoulder while putting on his blue lights and siren, and waited for Trooper Lamm to exit his patrol vehicle. Trooper Lamm was inside of his vehicle, and seconds after Trooper Ellerbe's arrival, exited his vehicle and started to walk back towards Trooper

Ellerbe's vehicle. Trooper Ellerbe then got out of his vehicle, with the two law enforcement officers meeting between the rear of Trooper Lamm's vehicle and the front of Trooper Ellerbe's vehicle. Trooper Lamm informed Trooper Ellerbe that Trooper Lamm was going to talk with Peart to see if she would give consent to search the vehicle. Consent to search the rental vehicle had not been given at the time of Trooper Ellerbe's arrival on the scene. The sole reason for Trooper Ellerbe's presence was to provide security. At that point, Trooper Ellerbe approached the passenger side of Trooper Lamm's vehicle and remained beside the car door for the duration of the traffic stop. Although defendant asked Trooper Ellerbe for permission to smoke a cigarette, defendant did not leave the vehicle. Trooper Ellerbe testified that this had become an officer safety issue, and that he did not want defendant to be outside of the vehicle during the traffic stop to smoke a cigarette. Even while Trooper Ellerbe and defendant engaged in conversation, this occurred through the passenger side window of Trooper Lamm's patrol car while defendant was seated in the vehicle.

As Trooper Ellerbe stood beside the front passenger door of Trooper Lamm's patrol car to provide security while defendant remained in the front passenger seat of Trooper Lamm's vehicle, Trooper Lamm proceeded to talk with Peart. Trooper Lamm asked Peart if there were any items in the rental car that were illegal. When the trooper, in the words of his testimony, "asked her . . . to search the car, she tried to—without saying, she tried to open the door. . . . [when I was] standing right there." Immediately following that portion of Trooper Lamm's testimony, the following

exchange took place between the questioning prosecutor and the answering witness, Trooper Lamm:

> Q.    What was she opening the door for?
>
> A.    She told me she was opening the door so I could – I think she might of said look or search. I don't remember the exact[] verbiage, but she was opening the door to get out so we could search the car.
>
> Q.    She was just getting out of your way so you [could] search?
>
> A.    Exactly, yes, sir.
>
> Q.    So, based on – at least by her actions she was consenting to your search of the vehicle; is that right?
>
> A.    Yes, sir.

Trooper Lamm then told Peart that he needed her to complete some paperwork for a search of the rental car. He gave her the State Highway Patrol form "Written Consent to Search," completed the form himself, and obtained Peart's signature on the form.

Trooper Lamm performed an initial search of the rental car and found cocaine in the backseat area of the Nissan. He notified Trooper Ellerbe to place defendant in handcuffs, and Trooper Ellerbe did so.

Upon consideration of all of the evidence presented at the suppression hearing, the trial court entered an order on 14 July 2015 which denied defendant's motion to suppress. On 20 July 2015, defendant pleaded guilty to the offenses of (1) trafficking in cocaine by transporting more than 200 grams but less than 400 grams of cocaine,

and (2) trafficking in cocaine by possessing more than 200 grams but less than 400 grams of cocaine. In exchange for defendant's guilty plea, the State agreed to dismiss the charges against his codefendant, Peart; to consolidate his two trafficking offenses for one judgment; and to stipulate to an active sentence of seventy to ninety-three months of imprisonment with a $100,000.00 fine. The trial court accepted defendant's plea, sentenced defendant to seventy to ninety-three months imprisonment, and imposed a $100,000.00 fine and $3,494.50 in costs. Defendant appealed to the Court of Appeals.

In his original appeal, defendant argued that the trial court erred in denying his motion to suppress evidence which was discovered pursuant to an unlawful traffic stop. Specifically, defendant asserted that the trial court made findings of fact which were not supported by competent evidence because his "initial investigatory detention was not properly tailored to address a speeding violation." Defendant further contended that Trooper Lamm seized him without consent or reasonable suspicion of criminal activity when Trooper Lamm ordered him to "sit tight" in the patrol car. Defendant therefore maintained that Trooper Lamm unlawfully seized items from the Nissan Altima vehicle during the ensuing search of the car and that these objects were "the fruit of the poisonous tree." The Court of Appeals agreed.

In a divided opinion, the Court of Appeals determined that Trooper Lamm's authority to seize defendant for speeding had ended when Trooper Lamm informed defendant that the officer was going to issue a warning citation for speeding and

provided defendant with a copy of the citation. The majority of the lower appellate court ultimately concluded that Trooper Lamm lacked reasonable suspicion to search the rental car after the traffic stop had been completed because the evidence relied upon by the trial court in support of its finding of reasonable suspicion constituted legal behavior which was consistent with innocent travel. Therefore, the Court of Appeals reversed the trial court's order denying defendant's motion to suppress.

On 5 October 2016, the State filed a petition for writ of *supersedeas* and a motion for temporary stay of this matter with this Court. On the same date, we allowed the State's motion for a temporary stay. The State filed a Notice of Appeal on 25 October 2016 pursuant to a dissenting opinion in the Court of Appeals which supported the State's position that the traffic stop was properly executed and that the disputed evidence was therefore admissible. On 2 November 2017, this Court vacated the opinion of the Court of Appeals and remanded the matter for reconsideration in light of this Court's recent decision in *State v. Bullock*, 370 N.C. 256, 805 S.E.2d 671 (2017). Upon remand, the Court of Appeals opined:

> In *Bullock*, after the officer required the driver to exit his vehicle, he frisked the driver for weapons. The Supreme Court held this frisk was lawful, due to concerns of officer safety, and the very brief duration of the frisk. The officer then required the driver to sit in the patrol car, while he ran database checks. The [C]ourt determined this did not unlawfully extend the stop either. The [C]ourt then held the officer had reasonable suspicion to thereafter extend the stop and search defendant's vehicle. The defendant's nervous demeanor, as well as his contradictory and illogical statements provided evidence of drug activity.

Additionally, he possessed a large amount of cash and multiple cell phones, and he drove a rental car registered in another person's name. The [C]ourt determined these observations provided reasonable suspicion of criminal activity, allowing the officer to lawfully extend the traffic stop and conduct a dog sniff.

*State v. Reed*, 257 N.C. App. 524, 529, 810 S.E.2d 245, 249 (2018) (citations omitted).

The majority of the panel below went on to conclude:

In reconsideration of our decision, we are bound by the Supreme Court's holding in *Bullock*. Therefore, we must conclude Trooper Lamm's actions of requiring [d]efendant to exit his car, frisking him, and making him sit in the patrol car while he ran records checks and questioned [d]efendant, did not unlawfully extend the traffic stop. Yet, this case is distinguishable from *Bullock* because after Trooper Lamm returned [d]efendant's paperwork and issued the warning ticket, [d]efendant remained unlawfully seized in the patrol car . . . [T]he governing inquiry is whether under the totality of the circumstances a reasonable person in the detainee's position would have believed that he was not free to leave.

Here, a reasonable person in [d]efendant's position would not believe he was permitted to leave. When Trooper Lamm returned [d]efendant's paperwork, [d]efendant was sitting in the patrol car. Trooper Lamm continued to question [d]efendant as he sat in the patrol car. When the trooper left the patrol car to seek Peart's consent to search the rental car, he told [d]efendant to "sit tight." At this point, a second trooper was present on the scene, and stood directly beside the passenger door of Trooper Lamm's vehicle where [d]efendant sat. Moreover, at trial Trooper Lamm admitted at this point [d]efendant was not allowed to leave the patrol car.

A reasonable person in [d]efendant's position would not feel free to leave when one trooper told him to stay in the patrol car, and another trooper was positioned outside the vehicle

-12-

door. Therefore, even after Trooper Lamm returned [d]efendant's paperwork, [d]efendant remained seized. To detain a driver by prolonging the traffic stop, an officer must have reasonable articulable suspicion that illegal activity is afoot.

As we concluded in our first opinion, Trooper Lamm did not have reasonable suspicion of criminal activity to justify prolonging the traffic stop. The facts suggest [d]efendant appeared nervous, Peart held a dog in her lap, dog food was scattered across the floorboard of the vehicle, the car contained air fresheners, trash, and energy drinks—all of which constitute legal activity consistent with lawful travel. While Trooper Lamm initially had suspicions concerning the rental agreement, the rental company confirmed everything was fine.

These facts are distinguishable from *Bullock* in which the officer observed the defendant speeding, following a truck too closely, and weaving briefly over the white line marking the edge of the road. Then the defendant's hand trembled as he handed over his license. Additionally, the defendant was not the authorized driver on his rental agreement, he had two cell phones, and a substantial amount of cash on his person. He failed to maintain eye contact, and made several contradictory, illogical statements.

*Id*. at 529–32, 810 S.E.2d at 249–50 (citations omitted). Accordingly, the Court of Appeals again held in a divided opinion that the trial court erred in denying defendant's motion to suppress and reversed the trial court's judgment. The State then exercised its statutory right of appeal to this Court based upon the dissenting opinion in the court below.

In the instant appeal, the State challenges the Court of Appeals decision which reverses the trial court's denial of defendant's motion to suppress. In doing so, the

State contends that Trooper Lamm's actions during the traffic stop were reasonable and, therefore, consistent with the Fourth Amendment. The constitutionality of Trooper Lamm's search-and-seizure activities following the traffic stop is the sole question before us.

**Standard of Review**

When considering on appeal a motion to suppress evidence, we review the trial court's factual findings for clear error and its legal conclusions de novo. *State v. Williams*, 366 N.C. 110, 112, 726 S.E.2d 161, 166 (2012). This requires us to examine "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011) (citing *State v. Brooks*, 337 N.C. 132, 140–41, 446 S.E.2d 579, 585 (1994)).

**Analysis**

The Fourth Amendment to the United States Constitution guards against "unreasonable searches and seizures." *See* U.S. Const. Amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see also Bullock*, 370 N.C. at 257, 805 S.E.2d at 673. Thus, a traffic stop is subject to the reasonableness requirement of the Fourth Amendment. In that regard, because a traffic stop is more analogous to an investigative detention than a custodial

arrest, we employ the two-prong standard articulated in *Terry* in determining whether or not a traffic stop is reasonable. *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

Under *Terry's* "dual inquiry," we must evaluate the reasonableness of a traffic stop by examining (1) whether the traffic stop was lawful at its inception, *see United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992), and (2) whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The United States Supreme Court has made clear that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (citation omitted). Although "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case, . . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Relatedly, "an investigatory detention must . . . last no longer than is necessary to effectuate the purpose of the stop." *Id.*

Consistent with this approach, "*Terry's* second prong restricts the range of permissible actions that a police officer may take after initiating a traffic stop." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). A stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its]

mission." *Illinois v. Caballas*, 543 U.S. 405, 407 (2005). As the United States Supreme Court explained in *Rodriguez v. United States*,

> [a] seizure for a traffic violation justifies a police investigation of that violation . . . [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, *it may last no longer than is necessary to effectuate that purpose*. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

575 U.S. 348, 354 (2015) (emphasis added) (citations omitted). Our Court's decisions are obliged to heed and implement these Fourth Amendment constraints, which have been articulated by the United States Supreme Court in *Terry* and its progeny, as the law of the land governing searches and seizures in traffic stops continues in its development, interpretation, and application. To this end, we have expressly held that "the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop." *Bullock*, 370 N.C. at 257, 805 S.E.2d at 673 (quoting *Caballas*, 543 U.S. at 407). Thus, a law enforcement officer may not detain a person "even momentarily without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 497–98. Further, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify . . . was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.* at 500.

In this case, defendant initially challenged the announced basis of the traffic stop as being unreasonable. We note, however, that defendant now concedes that the traffic stop was lawful at its inception due to a speeding violation; consequently, there is no issue which arises under the first prong of the *Terry* analysis that requires this Court's attention. However, defendant continues to argue that his seizure continued after the apparent conclusion of the purpose of the traffic stop and that this continuation was unconstitutional because Trooper Lamm had neither voluntary consent for a search of the vehicle nor any reasonable, articulable suspicion that criminal activity was afoot so as to further detain defendant. In response, the State argues that the initial lawful detention resulting from the traffic stop—which all parties agree was proper—had ended, but further contends that thereafter either defendant consented to the search of the rental vehicle and in the alternative, that any ongoing detention of defendant after the completion of the traffic stop was supported by reasonable, articulable suspicion. Therefore, our analysis begins with the second prong of *Terry* and its operation in the traffic stop context: whether Trooper Lamm "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Specifically, we must determine whether Trooper Lamm trenched upon defendant's Fourth Amendment rights when he extended an otherwise-completed traffic stop.

In the context of traffic stops, we recognize that police diligence "includes more than just the time needed to issue a citation." *Bullock,* 370 N.C. at 257, 805 S.E.2d at 673. Beyond determining whether to issue a traffic ticket, an "officer's mission includes ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* In addition, "[w]hile conducting the tasks associated with a traffic stop, a police officer's 'questions or actions . . . need not be solely and exclusively focused on the purpose of that detention.'" *United States v. Digiovanni,* 650 F.3d 498, 507 (2011) (quoting *United States v. Mason,* 628 F.3d 123, 131 (4th Cir. 2010)). An officer is permitted to ask a detainee questions unrelated to the purpose of the stop "in order to obtain information confirming or dispelling the officer's suspicions." *State v. Williams*, 366 N.C. at 116, 726 S.E.2d at 167 (citation omitted). However, an investigation unrelated to the reasons for the traffic stop must not prolong the roadside detention. *See Bullock*, 370 N.C. at 258, 805 S.E.2d at 674 ("Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped . . . are not permitted if they extend the duration of the stop." (citing *Rodriguez*, 575 U.S. at 356)); *see also Bowman*, 884 F.3d at 210 ("[P]olice during the course of a traffic stop may question a vehicle's occupants on topics unrelated to the traffic infraction . . . as long as the police do not extend an otherwise-completed traffic stop in order to conduct these unrelated investigations." (citation omitted)). To prolong a detention

"beyond the scope of a routine traffic stop" requires that an officer "possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

"Implicit in the very nature of the term 'consent' is the requirement of voluntariness. To be voluntary the consent must be 'unequivocal and specific,' and 'freely and intelligently given.' " *State v. Little*, 270 N.C. 234, 239, 154 S.E.2d 61, 65 (1967) (citation omitted). On the other hand, a determination of the existence of reasonable suspicion requires an assessment of "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

In applying these binding legal principles to the present case, we embrace the exercise of the law enforcement officer's diligence to actively engage defendant, upon the effectuation of the traffic stop, in the performance of the fundamental tasks which this Court identified in *Bullock* as being inherent in a routine, thorough traffic stop. In detaining defendant for the speeding violation, Trooper Lamm discovered that defendant had no outstanding warrants and that defendant's driver's license was valid. The trooper reviewed the registration documents of the Nissan Altima which defendant was operating and the proof of insurance materials and, while the officer found nothing illegal, nonetheless there were inconsistencies in the vehicle rental

agreement paperwork which prompted Trooper Lamm to dutifully question defendant and Peart about the details underlying the inconsistencies. Even after instructing defendant to exit the rental car, to enter the patrol car, and to close the front passenger door immediately beside defendant's seated position, the law enforcement officer was still properly within his authority to detain defendant as the trooper explored varying subjects with defendant; while some of these areas of inquiry were directly related to the rental agreement details and other areas meandered into more questionable categories such as the personal relationship between defendant and Peart as well as the ownership of the dog, nonetheless the United States Supreme Court in *Rodriguez* and our Court in *Bullock* and in *Williams* authorize such wide-ranging investigatory authority if they do not extend the duration of the traffic stop. The trooper even saw fit to contact the rental vehicle company office in New York while defendant remained seated in the law enforcement vehicle, as the officer received confirmation from the rental business that the vehicle was properly in the possession of Peart, with defendant as an authorized driver. While Trooper Lamm's exercise of his authority to seize defendant's liberty and to detain defendant's movement through this juncture was authorized by the cited case holdings of the United States Supreme Court, the Fourth Circuit Court of Appeals, and this Court, the return of the vehicle rental agreement paperwork, the issuance of the traffic warning ticket to defendant, and Trooper Lamm's unequivocal statement to defendant that the traffic stop had concluded all combine to bring an end to the law

enforcement officer's entitled interaction with defendant. The mission of defendant's initial seizure—to address the traffic violation and attend to related safety concerns—was accomplished. Trooper Lamm's authority for the seizure of defendant terminated when the trooper's tasks which were tied to the speeding violation had been executed. Therefore, as dictated by the United States Supreme Court in *Cabellas* and reinforced by *Rodriguez*, the traffic stop in the instant case became unlawful after this point because the law enforcement officer prolonged it beyond the time reasonably required to complete its mission.

While this Court determined that the law enforcement officer in *Bullock* did not unlawfully prolong the traffic stop at issue under the *Rodriguez* standard, *see Bullock*, 370 N.C. at 256, 257, 805 S.E.2d at 671, 673, the Court's reasoning in this case is quite instructive regarding the mission of a traffic stop in examining its factual distinctions from the current case. We have already noted our reiteration in *Bullock* of the well-established principle that the duration of a traffic stop must be limited to the length of time that is reasonably necessary to accomplish the mission of the stop. In *Bullock*, we expressly opined that "[t]he conversation that [the law enforcement officer] had with defendant while the database checks were running enabled [the officer] to constitutionally extend the traffic stop's duration" and noted that the officer "had three database checks to run before the stop could be finished." *Id.* at 263, 805 S.E.2d at 677. Here, in contrast, the record shows that Trooper Lamm testified at the suppression hearing that after the stop was finished, he said to defendant, "[t]his

ends the traffic stop and I'm going to ask you a few more questions if it is okay with you." This interaction, which was initiated by the law enforcement officer with defendant, occurred after the traffic stop was categorically recognized by the trooper to have concluded and before reasonable suspicion existed. This significant feature of the clear conclusion of the traffic stop in the case at bar, coupled with other vital factual dissimilarities between this case and *Bullock*—as persuasively detailed by the lower appellate court in its decision— effectively establish that the mission of the traffic stop had been consummated, that the continued pursuit of involvement with defendant by Trooper Lamm wrongly prolonged the traffic stop, and that defendant was unconstitutionally detained beyond the announced end of the traffic stop because reasonable suspicion did not exist to justify defendant's further detainment.

Similarly, the State's heavy reliance on *State v. Heien*, 226 N.C. App. 280, 741 S.E.2d 1, *aff'd per curiam*, 367 N.C. 163, 749 S.E.2d 278 (2013), *aff'd sub nom. on other grounds*, *Heien v. North Carolina*, 574 U.S. 54 (2014), is also unpersuasive in light of the factual distinctions and major legal differences regarding not only the existence of reasonable suspicion, but also a defendant's expression of his or her consent to search as conveyed to a law enforcement officer. In *Heien*, two law enforcement officers initiated a traffic stop of a vehicle based upon a malfunctioning brake light. *Id.* at 281, 741 S.E.2d at 3. There were two individuals in the subject vehicle: its operator and the defendant, who was lying down in the backseat of the vehicle. *Id.* at 284, 741 S.E.2d at 4. As the interaction occurred between the officers

and the vehicle's occupants, circumstances unfolded which ultimately led the lower appellate court to resolve legal issues pertaining to the concepts of reasonable suspicion and consent to search. *Id.* at 284–86, 741 S.E.2d at 4–5. In the present case, while the State extensively cites the Court of Appeals decision in *Heien* as persuasive authority, based on a number of factual similarities between the two cases, along with the Court of Appeals' interpretation and application of the law in determining that the encounter between the officers and the vehicle's occupants was consensual, nonetheless the differences between the two fact patterns and the resulting legal outcomes are consequential:

| *Heien* case | Present case |
|---|---|
| The operator of the vehicle was standing outside between the officer's vehicle and the subject car as the officer interacted with the driver. | The operator of the vehicle—defendant— was sitting inside the officer's vehicle as the officer interacted with defendant. |
| The second officer was positioned outside with the subject car's operator who was also allowed to be outside. | The second officer was positioned outside of the front passenger door of the patrol car in which defendant sat, as defendant was not allowed to be outside. |
| The officer who had received the pertinent documents from the subject car's operator during the traffic stop returned them, gave the driver a warning citation, and then asked the driver while both were outdoors if the driver would be willing to answer some questions. | The officer who had received the pertinent documents from the subject car's operator— defendant—during the traffic stop returned them, gave defendant a warning citation, and then asked defendant while both were inside the officer's patrol car if the driver would be willing to answer some questions. |
| The officer asked the person in charge of the subject car—the defendant—for permission to search the vehicle, and the defendant had no objection to the search. | The officer testified at the suppression hearing that he "told" the person in charge of the subject car—defendant's fiancée— that he "wanted to search the car," and "without saying anything, she tried to open |

| | the door so I could—I *think* she *might* of said look or search. I don't remember the exact verbiage, but she was opening the door to get out so we could search the car." (emphasis added) |
|---|---|
| The interaction between one of the officers and the operator of the subject car occurred in approximately one to two minutes, and the conversation between the other officer and the vehicle's driver lasted within a period of a minute to two minutes. | The traffic stop lasted for a duration of 14 minutes and 12 seconds, followed by an additional five minutes until the officer began his communication with the rental vehicle company for an unspecified period of time. |

In determining the result in *Heien*, the court below concluded:

> We believe that the trial court's conclusion that defendant consented to this search is reasonable and should be upheld, as we further believe a reasonable motorist or vehicle owner would understand that with the return of his license or other documents, the purpose of the initial stop had been accomplished and he was free to leave, was free to refuse to discuss matters further, and was free to refuse to allow a search.

*Id.* at 288, 741 S.E.2d at 6. The critical factual distinctions between *Heien* and the case at bar, and their collective effect upon the presence of reasonable suspicion and consent to search, render the Court of Appeals decision in *Heien* inapposite in the present case. Not only do these pertinent differences operate so as to make the State's major dependence upon *Heien* ineffective, but they also accentuate the fallacies and frailties of the dissenters' positions regarding the acceptability of the law enforcement officer's actions after the conclusion of the traffic stop in the instant case based upon what the dissenters contend is the existence of reasonable suspicion or consent to search defendant's vehicle.

An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). An obvious, intrinsic element of reasonable suspicion is a law enforcement officer's ability to articulate the objective justification of his or her suspicion. Both dissenting opinions conveniently presuppose a fundamental premise which is lacking here in the identification of reasonable, articulable suspicion: the suspicion must be articulable as well as reasonable. In the present case, Trooper Lamm offered contradictory statements during the suppression hearing concerning his formation of reasonable suspicion to validate his detainment of defendant. On one hand, Trooper Lamm testified that defendant was free to leave upon the completion of the traffic stop and construed defendant's act of remaining seated in the patrol car to be voluntary after its conclusion, despite having ordered defendant to close the passenger door of the patrol vehicle after defendant had entered it. However, on the other hand, Trooper Lamm later testified at the suppression hearing that although he had informed defendant that the traffic stop was completed, the officer still would have detained defendant in the patrol car, even if defendant wanted to leave, based upon Trooper Lamm's observations. These inconsistencies in the law enforcement officer's testimony illustrate the inability on the trooper's part to articulate the objective basis for his determination of reasonable suspicion and, of equal importance, the time at which he formulated such basis.

While our dissenting colleagues address the existence of reasonable suspicion and the consent to conduct a vehicle search by assuming that we have not properly considered the binding nature of the trial court's findings of fact in its order denying defendant's motion to suppress, we have indeed evaluated these findings and determined that they do not support the trial court's conclusions of law that Trooper Lamm was justified in prolonging the stop based upon a reasonable, articulable suspicion and that the trooper had received consent from defendant to extend the stop. In applying the very standard recognized by the dissenting opinion discussing reasonable suspicion that "[c]onclusions of law are reviewed de novo and are subject to full review," *Biber*, 365 N.C. at 168, 712 S.E.2d at 878 (citations omitted), coupled with our acceptance of the responsibility that "[u]nder a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal," *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted), we determine that the legal conclusions drawn by the trial court that the law enforcement officer had reasonable suspicion to prolong the traffic stop, and that the officer received voluntary consent to extend the stop and to search the vehicle, are not supported by the trial court's findings of fact.

With the two dissenting opinions' joint focus on the trial court's conclusions of law, our de novo review further reveals that the dissenters' dependence upon these conclusions of law to buttress their disagreement with our decision in this case is

faulty upon an examination of the combination of factors cited to constitute reasonable suspicion. Firstly, the reasonable suspicion dissent creatively conflates Peart's statement to Trooper Lamm that "they [Peart and defendant] were going to Fayetteville, and then she [Peart] also mentioned Tennessee and Georgia," coupled with defendant's failure to mention "anything about going to Tennessee or Georgia," with an inability by Peart to articulate where she and defendant were going so as to discern the presence of a factor which contributed to reasonable suspicion. Secondly, this dissent considered the trooper's view that it was "out of the ordinary" for the rental car to be a decided distance away from its designated geographic area to constitute reasonable suspicion pursuant to a cited case from the state of Arkansas. However, as noted earlier, the trooper was "able to determine the vehicle was in fact *properly* in possession of Ms. Pert [sic]" upon contacting the vehicle rental company by telephone. (Emphasis added). While the dissent regards the presence of coffee cups, energy drinks, pillows, sheets, trash, and dog food as raising Trooper Lamm's suspicions, "the presence of these items in a vehicle, without more, is utterly unremarkable." *Bowman*, 884 F.3d at 216. The dissent particularly emphasizes the presence of dog food scattered along the floor of the rental vehicle as a factor contributing to Trooper Lamm's reasonable suspicion; the importance of this element dims, however, when the existence of this dog food, along with a can of dog food and a jar of dog food, are available in the rental vehicle to feed the pit bull dog on a road trip traversing hundreds of miles. In continuing to identify the factors which

constituted the existence of the trooper's reasonable suspicion in its view, the dissent frames defendant's nervousness to close the passenger door of the patrol car as a solid indicator of the potential of defendant to flee the scene. This Court has expressly determined that general nervousness is not significant to reasonable suspicion analysis because" [m]any people become nervous when stopped by a state trooper." *Pearson*, 348 N.C. at 276, 498 S.E.2d at 601; *see also United States v. Palmer*, 820 F.3d 640, 649–50 (4th Cir. 2016) (concluding that a "driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police"). Indeed,

> [i]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity. *Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion.*

*United State v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (internal quotation marks and citations omitted) (emphasis added); *see also United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011).

Just as the dissenting opinion labors to elevate the payment of cash for the rental vehicle and other enumerated factors to the level of reasonable suspicion by adopting the same convenient speculative conclusions which the investigating trooper utilized to unlawfully prolong the traffic stop, the other dissenting opinion is plagued by identical shortcomings regarding the officer's attempts to justify the

voluntariness of the consent to search the rental vehicle. In the first instance, this dissent repeats the flimsy premise of the reasonable suspicion dissent that the trial court's findings of fact support the order's conclusions of law. In doing so, this dissent unfortunately confuses our de novo review of the conclusions of law in light of the findings of fact with a reevaluation of the evidence and the credibility of witnesses in order to find different facts. The dissent discussing consent to search shares the convenient approach of the dissent discussing reasonable suspicion in casually choosing to ignore the inconsistent testimony rendered by Trooper Lamm in his liberal discernment that he was somehow granted consent to search the rental car.

The dissent expressly agrees with the trial court's conclusion that, as a matter of law, Trooper Lamm received consent to extend the stop. It bases this ratification of the trial court's determination on the recognized principle that officers must determine whether a reasonable person, viewing the particular police conduct as a whole and within the setting of all of the surrounding circumstances, would have concluded that the officer had in some way restrained the defendant's liberty so that such a defendant was not free to leave. However, the trial court erred in its conclusion of law that "[d]efendant had no standing to contest the search of the grey Nissan Altima that he was driving since he was not the owner nor legal possessor of the vehicle and deferred to Ms. Peart, the legal possessor, when asked for consent to search the vehicle." The trial court made no finding of fact upon which to base this unsupported conclusion of law that defendant here had no standing to contest the

search. Defendant was an authorized operator of the rental vehicle, and his referral of the trooper to Peart about searching the vehicle did not divest defendant of the authority to grant consent to search the vehicle. The dissent further compounds its wayward stance on the trial court's conclusion of law that Trooper Lamm was justified in prolonging the traffic stop through the dissent's position that defendant himself prolonged the traffic stop by voluntarily remaining in the officer's patrol car to answer the trooper's questions after the conclusion of the stop, which is inconsistent with the dissent's simultaneous embrace of the trial court's determination that Peart prolonged the traffic stop through her grant of consent to search the rental vehicle. These inconsistent articulations by the dissent, which mirror the inconsistent articulations by the trooper on the matters of reasonable suspicion and consent to search, contribute largely to the dissent's agreement with the trial court's conclusions of law regarding these issues and to the dissent's misplaced reliance on *Heien*. The dissent cannot logically, on one hand, agree with the trial court's conclusion of law that defendant had no standing to contest the search and that Peart's consent to search validly prolonged the stop, while on the other hand, determining in its own analysis that defendant validly prolonged the stop by voluntarily remaining seated in Trooper Lamm's patrol car even following the trooper's inconsistent testimony about defendant's freedom to leave and after Trooper Lamm told defendant to "sit tight" as another trooper stood directly beside defendant's front passenger door.

Finally, while the dissenters couch our decision in a manner which they view as creating uncertainty among law enforcement officers and upsetting established law regarding the concepts of reasonable suspicion and consent to search, their collective desire to extend and to expand the ample discretion afforded to law enforcement officers to utilize their established and recognized authority in the development of reasonable suspicion and the attainment of consent to search would constitute the type of legal upheaval which they ironically claim our decision in this case creates. Clarity regarding a detained individual's freedom to leave serves to preserve and to promote the safety of both the motorist and the investigating law enforcement officer; the equivocal, presumptive, and inarticulable observations of the trooper here which the dissenters would implement as legal standards would serve to detract from such clarity. In reiterating the guiding principles established in the landmark United States Supreme Court cases of *Terry v. Ohio*, *Rodriguez v. United States*, and their progeny, applying the sturdy guidelines reiterated in our Court's opinions in *State v. Bullock* and *State v. Williams*, and explaining the distinguishing features of *State v. Heien*, we choose to sharpen the existing parameters of reasonable suspicion and consent to search rather than to blur them through an undefined and imprecise augmentation of these principles.

## Conclusion

Based upon the foregoing matters as addressed, we agree with the determination of the Court of Appeals that the trial court erred in denying

defendant's motion to suppress evidence which was obtained as a result of the law enforcement officer's unlawful detainment of defendant without reasonable suspicion of criminal activity after the lawful duration of the traffic stop had concluded. The officer impermissibly prolonged the traffic stop without a reasonable, articulable suspicion to justify his action to do so and without defendant's voluntary consent. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice NEWBY dissenting.

After the paperwork has been returned at the end of a traffic stop, can an officer ask an individual for consent to ask a few more questions? The majority seems to answer this question no, holding that asking for permission to ask a few more questions unlawfully prolongs the traffic stop. In so holding, the majority removes a long-standing important law enforcement tool, consent to search. A traffic stop can be lawfully extended based on reasonable suspicion or consent. I fully join Justice Davis's dissent and agree, as the trial court held, that Officer Lamm had reasonable suspicion to detain defendant and conduct the search after the initial traffic stop concluded. I write separately, however, to state that I would also uphold the search of the car based on defendant's consent to prolong the stop to answer a few more questions and the subsequent valid consent to search the car. I respectfully dissent.

Traffic stops present one of the most dangerous situations for law enforcement officers, yet policing our highways is vital for public safety. Knowing how to lawfully extend a traffic stop is important to law enforcement officers who daily encounter circumstances similar to those presented by this case. Before today's decision, the law regarding reasonable suspicion and consent was clear. Now the majority upsets this settled law and provides little guidance to law enforcement about how to proceed under these circumstances.

The majority holds that Officer Lamm's returning paperwork, issuing a traffic warning, and stating that the traffic stop had concluded ended his ability to interact with defendant, meaning that "the traffic stop in the instant case became unlawful after this point because the law enforcement officer prolonged [the stop] beyond the time reasonably required to complete its mission." Under the majority's approach, the traffic stop could not be lawfully prolonged even when defendant expressly permitted the officer to ask a few more questions. This holding effectively removes consent as a tool for law enforcement. Further, to reach its decision the majority fails to conduct the proper analysis of the trial court's order: An appellate court must determine whether the trial court's findings of fact are supported by competent evidence and whether those findings of fact support the trial court's conclusions of law. *State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012). Instead, on a cold record the majority reweighs the evidence and makes its own credibility determinations in finding facts. It then misapplies our precedent to unduly undermine the vital role of law enforcement.

Applying the appropriate standard, an appellate court first reviews the trial court's findings of fact. Here the trial court made the following findings:

> 24. That after Trooper Lamm told the Defendant that the traffic stop was complete, he then asked Defendant if he could ask him a few questions, and the Defendant responded in the affirmative.
>
> 25. That after asking the Defendant if there was anything illegal in the vehicle, the Defendant stated that "you can

break the car down[.]"

26. That after asking the Defendant if he could search his car, the defendant expressed *reluctance before directing Trooper Lamm to ask Ms. Peart since she was the lessee of the vehicle.* [(Emphasis added.)] At which time, Trooper Lamm left the patrol car, asked the defendant to sit tight, and went to ask Ms. Peart.

27. That when Trooper Lamm asked Ms. Peart for consent to search the vehicle, she verbally consented and signed a written consent form, and Trooper Lamm began the search of the grey Nissan Altima.

28. That during the search of the grey Nissan Altima, Trooper Lamm found suspected cocaine under the back seat of the vehicle.

29. Upon seeing the suspected cocaine that had been found under the back seat of the grey Nissan Altima, the Defendant made statements denying ownership or knowledge that the cocaine was in the car and stated he had even given his consent to search, and had also stated that "I said you can ask her (Ms. Peart)" and that "she gave consent."

These findings are supported by competent evidence in the record.[1]

---

[1] The trial court's findings of fact were based on the following evidence admitted at trial: After Officer Lamm issued defendant a warning ticket for speeding, Officer Lamm told defendant, "That concludes the traffic stop." At that point, defendant remained in Officer Lamm's patrol car. Officer Lamm then stated, "I'm completely done with the traffic stop, but I'd like to ask you a few more questions if it's okay with you. Is that okay?" Defendant responded in the affirmative. Officer Lamm asked defendant if he was carrying various controlled substances, firearms, or illegal cigarettes in the rental car. Defendant responded, "No, nothing, you can break the car down," which Officer Lamm interpreted as defendant giving permission to search the rental car. Nonetheless, to clarify defendant's response, Officer Lamm continued questioning defendant and subsequently said, "Look, I want to search your car, is that okay with you?" When defendant did not immediately respond, Officer Lamm stated, "It's up to you." Defendant asked why the officer wanted to search the vehicle,

Based on its findings of fact, the trial court concluded as a matter of law that Trooper Lamm "received consent to extend the stop."[2] The trial court also concluded that Officer Lamm's search was justified based on reasonable suspicion. Therefore, the trial court denied defendant's motion to suppress.

"[T]o detain a driver beyond the scope of the traffic stop, the officer must have the [appropriate person's] consent or reasonable articulable suspicion that illegal activity is afoot." *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 166–67 (2012) (first citing *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S. Ct. 1319, 1324, 75 L. Ed.

---

and Officer Lamm explained he wanted to look for any of the things previously mentioned, such as illegal drugs or firearms. Defendant then responded, "You gotta ask [Peart]. I don't see a reason why." Officer Lamm then questioned, "Okay. You want me to ask her since she is the renter on the agreement, right?" Defendant neither agreed nor disagreed but stated that he needed to go to the restroom, wanted to smoke a cigarette, and added that they were getting close to the hotel so he did not "see a reason why." At that point Officer Lamm asked, "Okay, so you're saying no?" Defendant did not answer the question but mentioned that Officer Lamm had initially frisked defendant at the beginning of the traffic stop. After further conversation, Officer Lamm said, "Alright, let me go talk to her, then. Sit tight for me, okay?"

Officer Lamm then got out of the patrol car and approached the rental car to speak to Peart. Officer Lamm asked Peart if he could search the rental car, and Peart, without verbally responding, immediately opened the door. Peart then explained that she was opening the door for Officer Lamm to search the car. Peart thereafter noted, "There's nothing in my car," but she gave verbal consent and then signed the form authorizing officers to search the rental car. During the search, officers discovered suspected cocaine under the back passenger seat. Thereafter, defendant stated that he, too, had given his consent to search.

[2] Notably, the trial court further concluded as a matter of law "[t]hat the Defendant had no standing to contest the search of the grey Nissan Altima that he was driving since he was not the owner nor legal possessor of the vehicle and deferred to Ms. Peart, the legal possessor, when asked for consent to search the vehicle." The State failed to present for review the issue of defendant's standing to challenge the search. Nonetheless, the majority incorrectly attempts to reach this issue despite it not being before this Court. Regardless, it is undisputed that defendant told Officer Lamm to seek permission from Peart and that Peart consented to the search.

2d 229, 236 (1983); then citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). The State argues before this Court that the search was supported by reasonable suspicion and was also valid as consensual. The State must prove "that the consent resulted from an independent act of free will." *United States v. Thompson*, 106 F.3d 794, 797–98 (7th Cir. 1997) (citing *Royer*, 460 U.S. at 501, 103 S. Ct. at 1319, 75 L. Ed. 2d at 238). Whether a defendant was seized at the time that officers obtained her consent requires an objective determination of "whether a reasonable person, viewing the particular police conduct as a whole and within the setting of all the surrounding circumstances, would have concluded that the officer had in some way restrained her liberty so she was not free to leave." *Id.* at 798 (citing *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979, 100 L. Ed. 2d 565, 571 (1988)) (recognizing that a defendant may still be free to leave, and interaction with police officers may still be consensual, even when the defendant is sitting in a police car). Whether an individual is free to leave is evaluated based on an objective standard, meaning it does not take into account the officer or individual's beliefs in that particular situation. *See id*; *State v. Nicholson*, 371 N.C. 284, 292, 813 S.E.2d 840, 845 (2018) ("It is well established, however, that '[a]n action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." ' " (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650, 658 (2006) (brackets and emphasis in original))).

While consent must be obtained voluntarily, a defendant need not be informed that he has a right to refuse. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S. Ct. 2041, 2059, 36 L. Ed. 2d 854, 875 (1973). Instead, whether a person gives consent voluntarily is evaluated based on "the totality of the circumstances surrounding the consent." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (7–6 decision) (citing *Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2047–48, 36 L. Ed. 2d at 862–63). This determination requires an evaluation of factors like "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *See id.* (first citing *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828, 46 L. Ed. 2d 598, 609 (1976); then citing *United States v. Analla*, 975 F.2d 119, 125 (4th Cir. 1992), *cert. denied*, 507 U.S. 1033, 113 S. Ct. 1853, 123 L. Ed. 2d 476 (1993); and then citing *United States v. Morrow*, 731 F.2d 233, 236 (4th Cir.), *cert. denied*, 467 U.S. 1230, 104 S. Ct. 2689, 81 L. Ed. 2d 883 (1984)).

The majority here cites the correct standard of review. The majority then proceeds with its analysis, without even mentioning any of the trial court's findings of fact, making only a passing reference to the trial court order. The majority instead finds its own facts to reach its conclusion. In doing so, it relies on its view of the officer's subjective state of mind instead of employing the correct objective standard.

Finding facts is not the job of an appellate court. This responsibility resides with the trial court, which makes credibility determinations based on face-to-face interactions with the parties before it.

When applying the correct standard of review, it is clear that the trial court's findings of fact here are supported by competent evidence in the record and that those factual findings support the trial court's conclusions of law. Officer Lamm explicitly told defendant that the traffic stop was finished before inquiring whether he could ask defendant additional questions. At this point defendant was no longer seized but was free to leave and to refuse Officer Lamm's request. *See State v. Heien*, 226 N.C. App. 280, 287, 741 S.E.2d 1, 5–6 ("Generally, the return of the driver's license or other documents to those who have been detained indicates the investigatory detention has ended."), *aff'd per curiam*, 367 N.C. 163, 749 S.E.2d 278 (2013), *aff'd sub nom. on other grounds*, *Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014).[3] Notably, Officer Lamm asked defendant if he could proceed with additional questions, and defendant expressly consented; Officer Lamm did not just begin questioning defendant without first acquiring defendant's consent to do so. Though defendant was still sitting in the patrol car at the time, this factor alone does not transform the consensual encounter, during which defendant was free to leave

---

[3] In rejecting the State's arguments about the similarities between *Heien* and this case, the majority frequently refers to the Court of Appeals' opinion in that case. Importantly, this Court affirmed *Heien* in a per curiam opinion, placing its approval on the Court of Appeals' opinion.

because the traffic stop had ended, into a nonconsensual interaction. *See Thompson*, 106 F.3d at 798. Thus, Officer Lamm initially prolonged the stop with defendant's consent. When asked if defendant and Peart had any illegal substances in the car, defendant responded, "No, nothing, you can break the car down." Defendant then told Officer Lamm that he would need to obtain Peart's consent to search the rental car. The officer reasonably kept defendant in the patrol car for officer safety while he talked with Peart.

Thereafter, Peart, the authorized renter of the car and the person with the authority to give consent, gave both verbal and written consent authorizing the search. Thus, at a time when defendant was not seized for Fourth Amendment purposes, Officer Lamm had, per defendant's express direction, obtained Peart's consent to search the car. *See Heien*, 226 N.C. App. at 287–88, 741 S.E.2d at 5–6 (concluding that, after officers had issued a warning ticket to the driver of a vehicle in which the defendant was the passenger and also returned the defendant passenger's driver's license, the encounter became consensual and officers could obtain valid consent to search the car from the defendant, who owned the car). Once defendant advised Officer Lamm to ask Peart for consent to search the car, Officer Lamm's request for defendant to stay in the patrol car for officer safety reasons was reasonable. *See State v. Bullock*, 370 N.C. 256, 262, 805 S.E.2d 671, 676 (2017) (recognizing that, in the context of facilitating the mission of the traffic stop itself, officers may take certain precautions justified by officer safety). Additionally, no one

contests that Peart's consent was voluntarily given. Significantly, once officers discovered drugs in the car, defendant told the officers he had consented to the search.

The trial court's findings of fact are supported by competent evidence in the record, and those findings of fact support the trial court's conclusion of law that the search was lawful. Thus, because I would also uphold the trial court's order denying defendant's motion to suppress based on valid consent as well as the existence of reasonable suspicion, I respectfully dissent.

Justice DAVIS dissenting.

I respectfully dissent from the majority's opinion. Even assuming *arguendo* that defendant's consent to the search of the vehicle was not voluntary, I believe that Trooper Lamm possessed reasonable suspicion to extend the traffic stop after issuing the warning ticket.

"The reasonable suspicion standard is a 'less demanding standard than probable cause' and a 'considerably less [demanding standard] than preponderance of the evidence.'" *State v. Bullock*, 370 N.C. 256, 258, 805 S.E.2d 671, 674 (2017) (alteration in original) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 576 (2000)); *see also State v. Watkins*, 337 N.C. 437, 442, 446 S.E.2d 67, 70 (1994) ("The only requirement is a minimal level of objective justification, something more than an 'unparticularized suspicion or hunch.'" (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989))). The reviewing court must consider "the totality of the circumstances—the whole picture." *Watkins*, 337 N.C. at 441, 446 S.E.2d at 70 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 628 (1981)).

All of the evidence, when considered together, must yield "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *State v. Jackson*, 368 N.C. 75, 78, 772 S.E.2d 847, 849 (2015) (quoting *Navarette v. California*, 572 U.S. 393, 396, 188 L. Ed. 2d 680, 686 (2014)). This objective basis must be premised upon "specific and articulable facts" and the "rational inferences"

therefrom, *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906 (1968), as understood by a "an objectively reasonable police officer," *Bullock*, 370 N.C. at 258, 805 S.E.2d at 674 (citation omitted). *See Watkins*, 337 N.C. at 441, 446 S.E.2d at 70 (holding that reasonable suspicion "must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training").

Our standard of review on appeal from orders ruling on motions to suppress is well-settled. We review a trial court's order to determine "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Nicholson*, 371 N.C. 284, 288, 813 S.E.2d 840, 843 (2018) (quoting *Jackson*, 368 N.C. at 78, 772 S.E.2d at 849). When a trial court's findings of fact are not challenged on appeal, "they are deemed to be supported by competent evidence and are binding on appeal." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citation omitted). The trial court's conclusions of law are reviewed *de novo. Id.*

In my view, a proper application of this standard of review in the present case requires that the trial court's order denying defendant's motion to suppress be affirmed. Here, the pertinent findings made by the court are largely unchallenged and therefore binding on us in this appeal. I believe that the majority has failed to properly consider these findings, which are sufficient to support the trial court's conclusion that Trooper Lamm had a reasonable basis to believe that further

investigation was warranted. As the trial court recognized, Trooper Lamm identified at the suppression hearing numerous factors that combined to create a reasonable suspicion that further investigation of possible criminal activity was appropriate.

First, the inconsistent statements of defendant and Peart concerning their travel plans raised Trooper Lamm's suspicions. Defendant stated that they were traveling from New York to Fayetteville to visit family, while Peart said that they were going to Fayetteville for a two-day trip but also mentioned driving to Tennessee and Georgia to visit some of her family members.[1] *See State v. Williams*, 366 N.C. 110, 117, 726 S.E.2d 161, 167 (2012) (holding that a passenger's "inability to articulate where they were going" is a factor contributing to reasonable suspicion).

Second, the rental agreement authorized the vehicle to be driven only in New York, New Jersey, and Connecticut. Trooper Lamm testified that he considered it "out of the ordinary" that the car was located approximately 500 miles away from the geographic area designated in the rental agreement. *Cf. Burks v. State*, 362 Ark. 558, 561, 210 S.W.3d 62, 65 (2005) (holding that officer had reasonable suspicion to extend

---

[1] At the suppression hearing, Trooper Lamm testified at one point that "all [Peart] wanted to say was they had family down and they were going to Fayetteville, and then she also mentioned Tennessee and Georgia." Shortly thereafter, Trooper Lamm stated that "the passenger was not certain where she was going with the driver other than they were going — that she was on a trip with him and it was a trip from New York to Fayetteville for a two-day turnaround trip." The trial court's finding of fact on this issue was that Trooper Lamm "learned from [Peart] that she was unsure of her travel plans." This finding is binding upon us in this appeal.

traffic stop in part because defendant's rental vehicle was "half a continent away" from the permitted driving locations).

Third, the fact that the rental car had been paid for with $750 in cash was also a factor in Trooper Lamm's decision to extend the stop, as he testified that "the majority of [rental car payments] we see [are] usually on a credit card." *Cf. Sokolow*, 490 U.S. at 8–9, 104 L. Ed. 2d at 11 (1989) (holding that paying for airline tickets with large sums of cash was "out of the ordinary" and could be considered as relevant when determining whether reasonable suspicion existed to investigate suspected drug couriers).

Fourth, the presence of empty coffee cups, energy drinks, pillows and blankets, and trash in the car—which gave the vehicle a "lived-in look"—also raised Trooper Lamm's suspicions. He testified that signs of "hard" and "continuous" driving are consistent with drug trafficking. Trooper Lamm further stated that indicia of attempts to "sleep and drive at the same time" are "things we've been trained to look for beyond the normal traffic stop [as] . . . an indicator [of criminal activity]." *See United States v. Finke*, 85 F.3d 1275, 1277–1280 (7th Cir. 1996) (holding that a vehicle that looked like the defendant "had been living in [it] for the last few days" was a factor supporting a finding of reasonable suspicion because the officer making the stop "knew from his training that drug couriers frequently make straight trips because they do not want to stop anywhere with a load of drugs in their vehicle").

Fifth, Trooper Lamm testified that the presence of dog food "strung throughout the car" is a tactic used by drug traffickers to distract police canines from detecting the scent of narcotics. *See Grimm v. State*, 458 Md. 602, 618, 183 A.3d 167, 176 (2018) (noting that dog food can be used as a distraction for police canines searching for narcotics).

Sixth, the presence of air fresheners in the vehicle—which Trooper Lamm believed to be unusual given that the vehicle was a rental car—was consistent with an additional tactic utilized by drug traffickers to mask the scent of narcotics and act as a diversion for police canines. *See, e.g.*, *Jackson v. State*, 190 Md. App. 497, 521, 988 A.2d 1154, 1167 (2010) (stating that drug traffickers "seem to enjoy an incorrigible affinity for air fresheners" and although "[t]here is nothing criminal" about them, their presence in a vehicle may be a "tell-tale characteristic[] of a drug courier").

Finally, Trooper Lamm testified that it was unusual for a person in defendant's position to be scared to shut the door of the patrol car upon entering the vehicle, despite the officer's order to close the door and the fact that it was raining outside. This conduct suggested to Trooper Lamm that defendant may have considered fleeing, an unusual desire for a person stopped for a mere speeding violation. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576 (2000) (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *see also United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997)

(holding that a defendant's "refusal to obey the officers' orders," when combined with other factors, supported a finding of reasonable suspicion).

None of the above referenced circumstances would give rise to reasonable suspicion *when viewed in isolation*. But that is not the test. To the contrary, it is the *totality* of the circumstances that must be examined. Here, the factors discussed above—when considered together—went well beyond a mere "unparticularized suspicion or hunch" that criminal activity may have been afoot. *Sokolow*, 490 U.S. at 15, 104 L. Ed. 2d at 15; *see id.* at 9, 104 L. Ed. 2d at 11 ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." (citation omitted)).

The majority fails to offer any explanation as to why these factors—when looked at together—were not enough to meet the relatively low standard necessary to establish reasonable suspicion. Instead, the majority examines each factor individually and in isolation despite the wealth of caselaw cautioning against such an approach. Not surprisingly, the majority fails to cite any case in which either this Court or the United States Supreme Court has held that reasonable suspicion was lacking in the face of anything close to the combination of circumstances presented here. Moreover, the majority incorrectly attempts to reweigh the credibility of Trooper Lamm's testimony despite the fact that the trial court expressly made findings as to his observations that are binding upon us in this appeal.

In determining that no reasonable suspicion existed, the majority also fails to view the evidence through the eyes of a law enforcement officer in light of his training and experience. This Court has recognized that the facts and inferences that can give rise to a trained law enforcement officer's suspicion of criminal activity "might well elude an untrained person." *Williams*, 366 N.C. at 116–17, 726 S.E.2d at 167 (citation omitted); *see also Cortez*, 449 U.S. at 419, 66 L. Ed. 2d at 629 ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."). The United States Supreme Court has made clear that "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418, 66 L. Ed. 2d at 629. (1996). As we stated in *Williams*:

> Viewed individually and in isolation, any of these facts might not support a reasonable suspicion of criminal activity. But viewed as a whole by a trained law enforcement officer who is familiar with drug trafficking and illegal activity on interstate highways, the responses were sufficient to provoke a reasonable articulable suspicion that criminal activity was afoot and to justify extending the detention until a canine unit arrived.

*Williams*, 366 N.C. at 117, 726 S.E.2d at 167; *see Ornelas v. United States*, 517 U.S. 690, 700, 134 L. Ed. 2d 911, 921 (1996) ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear

and tear, but to [the officer conducting the search], who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel.").

Here, the undisputed evidence showed that Trooper Lamm is an experienced law enforcement officer who has been employed by the State Highway Patrol for over eleven years, three of which were spent in the drug interdiction unit. I believe the majority errs in failing to take into any account whatsoever his training and experience upon being confronted by these circumstances.

This Court's recent decision in *State v. Bullock* constitutes a proper application of these principles. The defendant in *Bullock* was stopped on a highway for speeding while driving a rental car that contained a large amount of drugs. 370 N.C. at 256, 805 S.E.2d at 673. The defendant moved to suppress the evidence of the drugs, claiming that they were found only after the officer at the scene had unlawfully extended the stop without reasonable suspicion. *Id.* at 256, 805 S.E.2d at 673. We disagreed and held that the officer possessed reasonable suspicion to extend the stop and search defendant's vehicle. *Id.* at 256, 805 S.E.2d at 673. In so doing, this Court identified a number of factors that gave rise to reasonable suspicion: (1) Highway I-85 is a major thoroughfare for drug trafficking, (2) defendant possessed two cell phones, (3) the rental car was rented in another person's name, (4) the defendant appeared nervous when he was asked questions about where he was going and had driven miles past his alleged destination, (5) a frisk of defendant's person revealed $372 in cash, (6) defendant gave contradictory statements about the person he

claimed to be visiting, and (7) defendant lied about recently moving to North Carolina. *Id.* at 263–64, 805 S.E.2d at 677–78. None of these factors in isolation would likely have been sufficient to create reasonable suspicion. But collectively, they were enough for the officer to lawfully extend the traffic stop.

The same is true in the present case. Under the majority's analysis, Trooper Lamm somehow acted unconstitutionally simply by responding in accordance with his training upon his recognition of seven factors that were suggestive of criminal activity. Based on the majority's opinion, law enforcement officers in future cases who similarly observe a combination of circumstances that they have been taught to view as suspicious will presumably be forced to ignore their training and forego further investigation for fear of being deemed to have acted without reasonable suspicion. Accordingly, I respectfully dissent.

Justices NEWBY and ERVIN join in this dissenting opinion.